## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **JIMMY SISSOM,** | § | **CASE NO. 06-31917** |
| | § | **Chapter 7** |
| **Debtor** | § | |

## MEMORANDUM OPINION ON THE TRUSTEE'S AMENDED OBJECTION TO HOMESTEAD AND PERSONAL PROPERTY EXEMPTIONS UNDER 11 U.S.C. § 522(o) AND THE TEXAS PROPERTY CODE

### I. INTRODUCTION

For many years, pre-petition planning to enhance exemptions was considered appropriate.

Indeed, the legislative history of the Bankruptcy Code encouraged such planning:

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R. REP. NO. 95-595, at 361 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6317 (citation

omitted). In Texas, for example, courts have for many years held that a debtor was allowed, prior

to filing a bankruptcy petition, to liquidate nonexempt property and use the proceeds to pay down

the lien on the homestead. *First Texas Sav. Assoc., Inc. v. Reed (In re Reed)*, 700 F.2d 986, 900 (5th

Cir. 1983) (noting that under Texas law, fraudulent intent did not affect a debtor's ability to claim

an exemption in his homestead, although under 11 U.S.C. § 727(a)(2) debtors who convert

nonexempt assets into an exempt homestead on the eve of bankruptcy may be denied discharge);

*Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 482 (Bankr. W.D. Tex.

2004) (discussing the difference between unacceptable intent (e.g., to hinder, delay, or defraud a

creditor), and acceptable intent (e.g., to maximize legitimate exemptions)). Such liberal exemption

planning went hand in glove with a debtor's statutory right under Texas law to exempt a homestead regardless of its value. TEX. PROP. CODE ANN. § 41.001 (Vernon 2006).

The passage of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) in 2005 reflected a change in Congressional attitude toward exemption planning.  As one court has noted: "Congress began to put the brakes on the freedom with which states could protect their state residents by providing generous homestead protection laws." *In re Maronde*, 332 B.R. 593, 598 (Bankr. D. Minn 2005).  Specifically, BAPCPA added § 522(o).[1]  This subsection reduces the value of the debtor's exempt interest in a homestead to the extent attributable to any nonexempt property that the debtor disposed of for the purpose of increasing the debtor's equity in the homestead.  The look-back period for this subsection is ten years, and the objecting party has to show that the debtor disposed of the nonexempt property with the intent to hinder, delay, or defraud one or more creditors.

In the case at bar,  the Chapter 7 Trustee (the Trustee) has invoked § 522(o) to object to the Debtor's homestead exemption.  Specifically, the Trustee seeks to prevent the Debtor from exempting his claimed homestead to the extent of $61,540.99.  The Trustee contends that a few months prior to filing his Chapter 7 petition, the Debtor improperly used nonexempt cash of $61,540.99 to help purchase the real property that he now claims as his homestead.  This Memorandum Opinion sets forth this Court's reasoning for sustaining the Trustee's Amended Objection to the extent of $50,000.00 and overruling the Amended Objection to the extent of $11,540.99.  This Opinion will also set forth this Court's reasoning for overruling the Trustee's

---

[1] Unless otherwise noted, all section references refer to 11 U.S.C. and all references to the "Code" and the "Bankruptcy Code" refer to the United States Bankruptcy Code.

Amended Objection to the Debtor's exemption of certain personal property, including a television, stereo system, bunk bedroom set, and watch.

The Court makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52, as incorporated into Federal Rule of Bankruptcy Procedure 7052, and under Federal Rule of Bankruptcy Procedure 9014. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II. FINDINGS OF FACT

The facts, as stipulated to or admitted by the parties, or as adduced from testimony of various witnesses, or as established by the introduction of exhibits,[2] are as follows:

1.   The debtor in this case, Jimmy Sissom (the Debtor), married Susan Sissom (Ms. Sissom) in 1994. [Exhibit No. 27.] They are still married and have two minor children.

2.   Prior to filing his bankruptcy petition, the Debtor owned and operated certain businesses for several years, including a used car business.

3.   As of the date of the filing of his bankruptcy petition, one of the companies in which the Debtor had an interest was Dealer's Management Group, Inc. (DMGI), a Texas corporation.[3]

---

[2] Citations to exhibits refer to exhibits introduced by the Trustee during the hearing. The Debtor introduced no exhibits. Unless otherwise noted, all docket references refer to the docket in Case No. 06-31917.

[3] According to the Debtor's testimony, at the initial meeting of creditors held on May 24, 2006, the Debtor owned 100% of DMGI. [Exhibit No. 59, 26:16-20.]

4.     F & S Ventures, Inc. (F & S) is a Texas corporation in which the Debtor owned 500 shares prior to his filing a Chapter 7 petition.  F & S's major asset is a storage facility in Katy, Texas.

5.     On or about January 31, 2006, the Debtor and Crown Financial, L.L.C. (Crown) entered into a written agreement that included the following provisions:

   a.     Crown would purchase the Debtor's 500 shares of F & S stock for the amount of $200,000.00.  [Exhibit No. 17.]

   b.     Crown would loan $50,000.00 to the Debtor.

   c.     The Debtor would have a 90-day option to repurchase his 500 shares of F & S.

6.     On February 13, 2006, the transaction evidenced by the written agreement dated January 31, 2006 took place.  The Debtor, either directly or indirectly, received $225,100.00 in cash from Crown.[4]  Specifically, Crown remitted $189,740.00 to the Debtor and another $35,360.00 to DMGI, the company wholly owned by the Debtor.

7.     On February 13, 2006, immediately after receiving the $189,740.00 from Crown, the Debtor obtained four cashier's checks—each payable to Ms. Sissom—in the amounts of $39,740.00, $50,000.00, $50,000.00, and $50,000.00, respectively.  [Exhibit Nos. 16, 63, 67.]  On this same day, the Debtor delivered these four cashier's checks to Ms. Sissom.

8.     On March 10, 2006, Ms. Sissom deposited the $39,740.00 check into DMGI's account. [Exhibit Nos. 16, 22, 67.]

-----

[4]Because the sale price of the 500 shares of F & S was $200,000.00, and because the loan was for $50,000.00, the total amount of cash from Crown to the Debtor should have been $250,000.00.  However, the documentation introduced into the record reflected total cash of $225,100.00 passing from Crown to the Debtor.  According to the Debtor, the other $24,900.00 was a "broker's fee" that was deducted from the $250,000.00.

9.      On March 24, 2006, Ms. Sissom deposited one of the three $50,000.00 checks into DMGI's account. [Exhibit Nos. 16, 22, 67.]

10.     On April 3, 2006, the Debtor was served with a summons and petition in a case styled *Royal Oaks Bank S.S.B. v. Dealer's Management Group, Inc. and Jimmy W. Sissom*, Cause No. 2006-16529, in the District Court of Harris County, Texas, 151st Judicial District (the State Court Lawsuit). Royal Oaks Bank had filed the State Court Lawsuit on March 10, 2006, after its counsel had sent a letter to the Debtor on February 28, 2006 threatening to file a lawsuit to collect indebtedness that the Debtor had guaranteed. [Exhibit Nos. 73, 74.]

11.     On April 7, 2006, Ms. Sissom and David Weekley Homes entered into a Real Estate Purchase Agreement whereby Ms. Sissom would purchase certain real property located in Bastrop County, Texas. [Exhibit No. 50.] Specifically, this property was a newly-built house located at 106 Eight Oaks Drive, Bastrop Texas (the Bastrop Property). The purchase price of the Bastrop Property was $302,240.00.

12.     On April 11, 2006, the Debtor and Ms. Sissom entered into a Real Estate Purchase Contract with Sandra and Jose Perez whereby the latter would purchase certain real property located in Fort Bend County, Texas. [Exhibit No. 42.] Specifically, this property was a house located at 4315 Waterlily Court, Missouri City, Texas (the Missouri City Property). The Missouri City Property was the homestead of the Debtor and Ms. Sissom at the time they entered into the contract with Mr. and Ms. Perez. On the same day, the Perezes delivered a $3,000.00 earnest money check to the Sissoms [Exhibit Nos. 69, 72]; on the next day, April 12, 2006, this $3,000.00 check was deposited into Account Number 637889346 at Chase

Bank, an account solely in the name of Ms. Sissom (the Chase Account).[5] [Exhibit Nos. 20, 69.]

13.    On April 13, 2006, Ms. Sissom deposited one of the two $50,000.00 checks still in her possession into the Chase Account.   [Exhibit Nos. 16, 20, 69.]

14.    On April 18, 2006, Ms. Sissom obtained a $50,000.00 cashier's check from Chase Bank by withdrawing funds in this amount from the Chase Account.   [Exhibit Nos. 20, 48.]   The cashier's check was made payable to Independence Title Company.   [Exhibit Nos. 48, 58.]

15.    On April 19, 2006, Ms. Sissom obtained a $11,540.99 cashier's check from Chase Bank [Exhibit No. 48] by withdrawing $2,540.99 from the Chase Account [Exhibit No. 20] and obtaining $9,000.00 from an undisclosed source.   This cashier's check was also made payable to Independence Title Company.   [Exhibit No. 58.]

16.    On April 20, 2006, Ms. Sissom, in order to effectuate the purchase of the Bastrop Property, signed the following documents:

a.    Loan Application [Exhibit No. 54]—In this application, Ms. Sissom represented to the prospective lender, America's Wholesale Lender (AWL), that title to the Bastrop Property would be held in both her name and the Debtor's name, and that the Bastrop Property would be community property [Exhibit No. 54, p.000042];

b.    Promissory Note in the original principal amount of $241,792.00 payable to AWL [Exhibit No. 51];

---

[5] As discussed subsequently in this Opinion, although the Chase Account was in Ms. Sissom's name, the funds in this account were community property in which the Debtor had an interest.

c.   Deed of Trust in order to secure the Promissory Note with the Bastrop Property [Exhibit No. 53];

d.   Planned Unit Development Rider [*Id.*];

e.   Second Home Rider—This document expressly states that the Bastrop Property is the "Borrower's second home"[6] [*Id.*];

f.   Closing Affidavit [Exhibit No. 55]; and

g.   Settlement Statement [Exhibit No. 49].

17.   On April 20, 2006, after signing the documents described above in Fort Bend County, Ms. Sissom sent these documents, together with the April 18 cashier's check for $50,000.00 and the April 19 cashier's check for $11,540.99, by overnight delivery to Independence Title Company in Austin, Texas.

18.   On April 21, 2006, a closing agent for Independence Title Company received the documents and checks that Ms. Sissom had sent the previous day by overnight delivery. This closing agent proceeded to effectuate the sale of the Bastrop Property by signing the Settlement Statement and initiating the funding of the loan by AWL. [Exhibit Nos. 49, 62.] The Settlement Statement expressly set forth that the settlement date and funding date was "4/21/2006."

19.   On April 23, 2006, the Debtor and Ms. Sissom executed a warranty deed on the Missouri City Property for the benefit of Mr. and Ms. Perez. [Exhibit No. 46.]

---

[6] At the time that the Bastrop Property was purchased, the Sissoms still owned the Missouri City Property, which was their homestead. However, soon after the Bastrop Property was purchased, the Sissoms sold the Missouri City Property, which meant that the Bastrop Property was no longer a second home.

20.     On April 24, 2006, Susan E. Clark, a Notary Public, executed the acknowledgment on an

        instrument entitled "Warranty Deed with Vendor's Lien." [Exhibit No. 52.] This is the deed

        that conveyed the Bastrop Property to Ms. Sissom. Lisa Ahart, an authorized agent of

        Weekley Homes, L.P. d/b/a David Weekley Homes, executed this deed. With the delivery

        of this Warranty Deed, full title to the Bastrop Property vested in Ms. Sissom's name.[7]

21.     On April 24, 2006, Mr. and Ms. Perez completed the purchase of the Missouri City Property

        from the Debtor and his wife by wire transferring monies to pay off the first lien held by

        ABN AMRO Mortgage Group, Inc. of $145,440.86 and the second lien held by JP Morgan

        Chase Bank, N.A. of $19,132.36, and also by wire transferring from the Perezes' account at

        Edward Jones the sum of $75,426.78 to the Chase Account. [Exhibit No. 20.] There was

        no broker in this transaction. After JP Morgan Chase Bank, N.A. and ABN AMRO

        Mortgage Group, Inc. received the funds paying off their respective liens, each executed

        Releases of Lien. Both instruments were recorded in the Official Public Records of Fort

        Bend County, Texas. [Exhibit Nos. 70, 71.]

22.     On April 25, 2006, Ms. Sissom obtained a cashier's check for $70,426.78 by withdrawing

        funds in this amount from the Chase Account. [Exhibit Nos. 20, 75.]

23.     On April 26, 2006, the warranty deed that the Sissoms had executed for the benefit of the

        Perezes on April 23, 2006 was recorded in the Official Public Records of Fort Bend County,

---

[7] As discussed subsequently in this Opinion, although the deed was only in Ms. Sissom's name, the Bastrop Property is community property in which the Debtor had an interest on the date of the filing of his Chapter 7 petition. Further, the fact that the deed was not actually executed until April 24, 2006 does not change this Court's finding that the closing took place on April 21, 2006. April 21 was a Friday, and apparently what happened was that the closing agent signed the Settlement Statement and funding took place on that day, but the deed itself was not executed until Monday, April 24.

Texas. [Exhibit No. 46.] Title to the Missouri City Property therefore became fully vested in the Perezes' name.

24.     On May 1, 2006, Ms. Sissom, using the cashier's check for $70,426.78, purchased a cashier's check in the amount of $63,049.01. [Exhibit Nos. 72, 75.] The record is not clear what Ms. Sissom did with this cashier's check for $63,049.01. Nor is the record clear what she did with the remaining $7,377.77 from the original $70,426.78 cashier's check. [Exhibit No. 75.]

25.     On May 2, 2006, Barbara M. Rogers (Ms. Rogers), who was providing pre-petition counsel to the Debtor and later represented the Debtor in his Chapter 7 case, sent an e-mail to the Debtor containing the following statement: "Last week you advised me that you and your wife had sold your home and had received a sum of money equal to over $75,000.00, and that you were holding off on investing that money in a new Texas homestead." [Exhibit No. 68-P.]

26.     On May 3, 2006, the Debtor filed a voluntary Chapter 7 petition in this Court. [Exhibit No. 1.] Ms. Sissom did not join her husband in filing this Chapter 7 case.

27.     On May 3, 2006, the Debtor filed his original Statement of Financial Affairs (SOFA), in which he represented that in April 2006, he had sold his homestead—identified as the Missouri City Property—to an "Unrelated Third Party." [Id.] On this same date, the Debtor also filed his initial Schedules, and in his Schedule A represented to this Court that he owned no real estate on the date of the filing of his bankruptcy petition. [Id.] The Summary of Schedules filed on this date reflected that the Debtor had total assets of $1,293,495.00 and total liabilities of $1,059,244.09. [Id.] $900,000.00 of the total asset figure of

$1,293,495.00 came from the value that the Debtor, in his initial Schedule B, placed on his interest in F & S stock. In his original SOFA, the Debtor made no disclosure of the sale of the F & S stock on February 13, 2006; rather, he represented that he had pledged his F & S stock as collateral for a $250,000.00 loan. [*Id.*] Nor did the Debtor disclose transferring $189,740.00 to his wife by delivering four cashier's checks to her, or her use of $50,000.00 of this $189,740.00 to purchase the Bastrop Property. Nor did the Debtor disclose the purchase of the Bastrop Property that was effectuated on April 21, 2006. However, in his initial Schedule F, the Debtor did disclose that he owes the amount of $695,085.00 to Royal Oaks Bank. [*Id.*]

28.   On May 18, 2006, Ms. Sissom used the remaining $50,000.00 cashier's check in her possession to purchase three separate cashier's checks: one check in the amount of $20,000.00 made payable to Carz N More;[8] the second check in the amount of $15,000.00 made payable to Ms. Sissom; and the third check in the amount of $15,000.00 also made payable to Ms. Sissom. [Exhibit Nos. 16, 76.]

29.   On May 22, 2006, Ms. Sissom used one of the $15,000.00 cashier's checks to purchase a cashier's check in the same amount made payable to Buttross Properties.[9] [Exhibit No. 76.]

---

[8] It is unclear whether the Debtor has an interest in Carz N More and, if so, to what extent. At the initial meeting of creditors, held on May 24, 2006, the Debtor testified that Carz N More was "one of the companies I do some buying for." [Exhibit No. 59, 30:11-14.] At his deposition on September 7, 2006, the Debtor testified that he is a signatory on Carz N More's account at Wachovia Bank. [Exhibit No. 60, 25:25–26:2.] While there was a dearth of testimony about this entity, the evidence reflects that Carz N More endorsed the $20,000.00 check and deposited the monies into its account at Wachovia Bank on May 19, 2006. [Exhibit No. 16.]

[9] The record is unclear as to who owns Buttross Properties, which is apparently the same entity as Buttross Holding, Inc. In a motion recently filed in Adversary Proceeding No. 06-03565, a suit brought by the Trustee in which the Debtor and Ms. Sissom, among others, are defendants, counsel for the movant—a Mr. C.J. Collet—makes the following statements in paragraph six: "The other transaction complained of by the Trustee against Defendant Collet involves $15,000.00 paid by Mrs. Susan Sissom to Buttross Holdings, Inc., which has been dismissed as a party defendant. This money was invested as part of the purchase prices of commercial property by a partnership of Susan

30.  On May 25, 2006, Ms. Sissom used the other $15,000.00 cashier's check to purchase another
     cashier's check in the same amount made payable to Ms. Sissom.[10] [*Id.*]

31.  On August 17, 2006, the Debtor filed his first amended Schedule B, which set forth that the
     total current value of his personal property was $393,495.00.[11] [Exhibit No. 2.] This figure
     was $900,000.00 less than the corresponding figure of $1,293,495.00 set forth in the original
     Schedule B filed on May 3, 2006. In the original Schedule B, the Debtor set forth that he
     owned stock in F & S valued at $900,000.00, whereas in the amended Schedule B, he deleted
     the reference to the F & S stock and its corresponding value of $900,000.00. Along with his
     first amended Schedule B, the Debtor also filed an amended SOFA.[12] [Exhibit No. 3.] In
     this amended SOFA, the Debtor represented to this Court that he had sold his F & S stock
     for $250,000.00 with an option to repurchase [*Id.*], whereas in his original SOFA, the Debtor
     represented that he had pledged his F & S stock as collateral for a $250,000.00 loan.

---

Sissom and C.J. Collet. Mr. Collet acknowledges that Mrs. Susan Sissom owns a 20% interest in the property, in
consideration for the $15,000." [Adversary No. 06-03565, Docket No. 107.] If Ms. Sissom owns 20%, then the Debtor
also has an interest because the $15,000.00 paid by Ms. Sissom constituted community funds used during the marriage.
TEX. FAM. CODE ANN. §§ 3.001-003 (Vernon 2006); *In re Knott*, 118 S.W.3d 899, 902 (Tex. App.—Texarkana, 2003,
no pet.) ("In Texas, all property acquired by a spouse during the marriage generally belongs to the marital community,
except property acquired by gifts, devises or descent"); *Evans v. Evans*, 14 S.W.3d 343, 346 (Tex. App.—Houston [14th
Dist.], 2000, no pet.). Accordingly, because his interest in Buttross Properties is community property, it is property of
the Debtor's bankruptcy estate, *In re McCloy*, 296 F.3d 370, 373 (5th Cir. 2002) and should have been disclosed. *See
U.S. v. Johnston*, 267 B.R. 717, 722 (N.D. Tex. 2001) (holding that the Official Form for Schedule A, regarding real
property, requires disclosing whatever kind of interest the Debtor has, including whether it is a community interest). In
the case at bar, the Official Form for Schedule B, regarding personal property, contains language similar to the Official
Form for Schedule A and also requires the Debtor to disclose property in which he has a community interest.

[10] This is not a typographical error. Ms. Sissom did, in fact, use the $15,000.00 cashier's check payable to
herself in order to purchase another $15,000.00 cashier's check payable to herself. Neither the Debtor nor Ms. Sissom
has accounted for where these monies are or how they have been spent, if in fact they have been spent.

[11] While Schedule B was signed by the Debtor on August 2, 2006, it was not filed until August 17, 2006.
[Docket No. 24.] Additionally, because the Debtor did not list any real property on these amended Schedules,
$393,495.00 represented not only the value of his personal property, but also the value of all of his assets.

[12] While the SOFA was signed by the Debtor on August 2, 2006, it was not filed until August 17, 2006. [Docket
No. 26.]

11

[Exhibit No. 1.] Although the Debtor did not file an amended Summary of Schedules on this date, given the deletion of the F & S stock and the fact the Debtor did not amend any schedules regarding liabilities, the Debtor was representing to this Court that his total assets were $393,495.00 and his total liabilities were $1,095,244.09.

32.   On August 29, 2006, the Debtor filed his first amended Schedules A and C-J and his second amended Schedule B. [Exhibit No. 6.] The amended Schedule A, contrary to the original Schedule A, now represented that the Debtor did own real estate and that this real estate was the Bastrop Property. [*Id.* at Schedule A.] The Debtor scheduled this real property as community property having a value of $369,383.64. [*Id.* at Schedule A.] Amended Schedule D also represented that the lienholder on the Bastrop Property is AWL, and that AWL holds a secured claim in the amount of $302,240.00. [*Id.* at Schedule D.] In his amended Schedule C, the Debtor sought to exempt the Bastrop Property as his homestead under Texas law pursuant to Texas Constitution Article XVI, §§ 50, 51 and Texas Property Code §§ 41.001 and 41.002. [*Id.* at Schedule C.] The Debtor reinserted the F & S stock into amended Schedule B, although this time he valued his interest in F & S at $2.8 million (as opposed to $900,000.00), and stated that this interest represented 50% of the total value of F & S (as opposed to 100%). In his Amended Schedule F, the Debtor deleted any reference to the $695,085.00 loan for which he is liable to Royal Oaks Bank under his guaranty. The Debtor also filed an Amended Summary of Schedules which reflected that, with the filing of this round of amended Schedules, the Debtor was now representing to this Court that his total assets were $3,748,961.59 and his total liabilities were $893,375.58. [Exhibit No. 6.]

33.   On September 8, 2006, the Debtor filed another round of amended Schedules, this time amending Schedules A, B, C, D, and F. [Exhibit No. 8.] In these amended Schedules, the Debtor continued to claim the Bastrop Property as his homestead. In his Amended Schedule B, the Debtor deleted any reference to F & S stock. In his Amended Schedule F, the Debtor disclosed once again that he is liable to Royal Oaks Bank in the amount of $696,000.00. The Debtor also filed another Amended Summary of Schedules which reflected that, with the filing of these amended Schedules, the Debtor was now representing to this Court that his total assets were $998,961.59 and his total liabilities were $1,374,290.58.

34.   On September 12, 2006, the Debtor filed another amended Schedule B representing for the first time to this Court that the Debtor owned an account receivable from DMB in the amount of $190,000.00[13] as well as a second account receivable from F & S in the amount of $220,000.00. [Exhibit No. 9.] Although the Debtor did not file an amended Summary of Schedules on this date, given the addition of these two receivables and the fact the Debtor did not amend any Schedules regarding liabilities, the Debtor was now representing to this Court that his total assets were $1,408,961.59 and his total liabilities were $1,374,290.58.

35.   On October 16, 2006, the Debtor filed another amended Schedule F, which provided further information about his debts, but did not add, modify, or delete any debt. [Exhibit No. 10.] Thus, as of October 16, 2006, the Debtor was still representing to this Court that his total assets were $1,408,961.59 and his total liabilities were $1,374,290.58.

36.   On November 8, 2006, the Debtor filed yet another set of amended Schedules. [Exhibit No. 11.] At this time, the Debtor represented that the Bastrop Property, which he continued to

---

[13] There is a dearth of evidence in the record as to what type of entity DMB is or who owns it.

13

claim as his homestead, was valued at $302,240.00 (as opposed to the figure of $369,383.64 set forth in previous Schedules) and subject to a lien of $241,792.00 (as opposed to the lien amount of $302,240.00 as set forth in previous Schedules). [*Id.*] The Debtor also filed another Amended Summary of Schedules which reflected that, with the filing of the amended Schedules, the Debtor was now representing to this Court that his total assets were $700,557.95 and his total liabilities were $1,313,842.58.

37.     In his original Schedule B and his amended Schedule B of August 17, 2006, the Debtor listed the Chase Account as being in his "[w]ife's name only" and as having a balance of $10,000.00. [Exhibit Nos. 1 and 2.] Moreover, the Debtor stated that the balance of $10,000.00 represented "[r]emaining proceeds from sale of homestead." [*Id.*]

38.     On August 24, 2006, the Debtor produced to the Trustee the monthly statement for the Chase Account for the period April 6, 2006 through May 3, 2006. This statement reflects the following transactions:

    a.     a deposit of $50,000.00 on April 13, 2006;

    b.     a withdrawal of $50,000.00 on April 18, 2006;

    c.     a deposit of $75,426.78 on April 24, 2006; and

    d.     a withdrawal of $70,426.78 on April 26, 2006.

[Exhibit No. 20.]

39.     On August 24, 2006, the Debtor also produced to the Trustee a spreadsheet, without dates, purporting to detail the following payments from the Chase Account:

    a.     a house down payment in the amount of $67,143.64;

    b.     a payoff of an Escalade automobile in the amount of $12,500.00;

14

    c.      a payoff of a 2002 Suburban Z71 automobile in the amount of $20,000.00;

    d.      taxes in the total amount of $7,377.77;

    e.      eye surgery in the amount of $4,200.00;

    f.      "Ryan tonsils" in the amount of $2,000.00;[14]

    g.      cash to Kristine Garbo in the amount of $15,000.00;[15]

    h.      cash receipts totaling $5,460.52; and

    i.      house repairs totaling $7,500.00.

[Exhibit No. 31.]

40.     In his amended Schedule B of August 29, 2006, the Debtor changed his representation concerning the Chase Account by stating that the balance was $5,227.95 [Exhibit No. 6], not $10,000.00 as set forth in previously filed Schedule Bs.  Further, the amended Schedule B of August 29, 2006 eliminated the declaration that the balance of the Chase Account was the "[r]emaining proceeds from sale of homestead."  [*Id.*]

41.     In late May or early June of 2006, Ms. Sissom and her two sons (who are also the Debtor's two sons) moved to the Bastrop Property, and have been residing there ever since.

42.     At or about the time the Debtor filed his Chapter 7 petition, i.e., May 3, 2006, he began residing at 1911 Trixie Lane, Houston, TX 77042, and has been residing there ever since.

43.     On August 25, 2006, this Court, without opposition from the Debtor, signed an order allowing Barbara M. Rogers to withdraw as the Debtor's counsel in this Chapter 7 case. [Exhibit No. 4.] In her motion to withdraw, which was filed on August 17, 2006, Ms. Rogers

---

[14] Ryan Sissom is one of the Debtor's two minor sons.

[15] Kristine Garbo is the Debtor's mother-in-law, i.e., Ms. Sissom's mother.

stated that her reason for withdrawing was the Debtor's lack of communication and unwillingness to provide documents to her or the Trustee. [*Id.*]

44. On August 25, 2006, this Court signed an order approving the Debtor's motion to substitute Craig Cowgill and Associates P.C. as counsel for the Debtor in this Chapter 7 case. [Exhibit No. 5.]

45. On January 16, 2007, this Court, without opposition from the Debtor, signed an order allowing Craig Cowgill and Associates P.C. to withdraw as the Debtor's counsel in this Chapter 7 case. [Docket No. 88.] In his motion to withdraw, filed on January 15, 2007, Mr. Cowgill stated that his reasons for withdrawing were that the Debtor had disregarded their agreement, and had said he could no longer employ Mr. Cowgill. [Docket No. 87.]

46. On October 11, 2006, the Debtor, at this time still represented by Mr. Cowgill, filed a Waiver of Right to Discharge setting forth that he would not be discharged of any of his debts pursuant to § 727(a)(10). [Docket No. 70.]

47. On March 20, 2006, the Debtor, using one of his credit cards, purchased from FurnitureBuzz.com a bunk bedroom set for one of his minor children in the amount of $1,266.00. [Exhibit No. 39.]

48. On March 28, 2006, the Debtor, using one of his credit cards, purchased from Hal Martin's a watch in the amount of $3,227.00. [Exhibit No. 40.]

49. On April 15, 2006, the Debtor, using one of his credit cards, purchased from Fry's Electronics a 52" Mitsubishi television set with television stand and extended warranty, plus a smaller television set, in the amount of $4,073.50. [Exhibit No. 39.]

50.     On April 23, 2006, the Debtor, using one of his credit cards, purchased from Best Buy a Bose surround sound stereo system, in the amount of $1,090.43. [*Id.*]

51.     In his final amended Schedule C dated November 8, 2006, the Debtor claimed the bunk bedroom set, the television sets, and the stereo system as exempt. [Exhibit No. 76.] The watch from Hal Martin's was not claimed as exempt; indeed, this watch was not listed in any of the Debtor's Schedules.[16]   On June 3 and 4, 2006, the Debtor and his family held a moving/garage sale during which he sold various assets which he owned on the date of the filing. The total proceeds of this sale were $18,115.00. [Exhibit No. 40.] Neither the Debtor nor Ms. Sissom have ever turned over these proceeds to the Trustee.

52.     On November 16, 2006, the Trustee filed his initial Objection to Homestead and Personal Property Exemptions under 11 U.S.C. § 522(o) and the Texas Property Code. [Docket No. 77.]

53.     On November 16, 2006, the Trustee filed his Amended Objection to Homestead and Personal Property Exemptions under 11 U.S.C. § 522(o) and the Texas Property Code (the Amended Objection). [Exhibit No. 12.] The Trustee filed the Amended Objection because the Trustee, in the initial objection, failed to include the paragraph required by Bankruptcy Local Rule 9013 that anyone who wanted to oppose the Trustee's position had to file a response within 20 days. Aside from this difference, the Amended Objection and the initial Objection are identical.

---

[16] Apparently, the Debtor did not schedule the watch because prior to filing his bankruptcy petition, he gave it to Mr. James Cullwell, a business associate, as part of a barter agreement that took place prior to the filing of the Debtor's petition. [Exhibit No. 40.]

54.     On December 6, 2006, the Debtor, through his then attorney of record, Craig Cowgill, filed

        a Response opposing the Amended Objection. [Exhibit No. 13.]

55.     On December 6, 2006, Ms. Sissom, through her then attorney of record, H. Gray Burks IV,[17]

        filed a Response opposing the Amended Objection.  [Exhibit No. 14.]

56.     The hearing on the Amended Objection took place on January 30, February 5, February 14,

        and February 21, 2007.


### III. CONCLUSIONS OF LAW

#### A.     Jurisdiction and Venue

        This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and

28 U.S.C. §§ 157(b)(2)(A), (B), and (O).  This contested matter is a core proceeding pursuant to 28

U.S.C. §§ 157(b)(2)(A), (B), and (O).  Venue is proper pursuant to 28 U.S.C. §1408(1).

#### B.     Elements of § 522(o)

        11 U.S.C. § 522(o) is one of the new provisions of the Bankruptcy Code resulting from the

passage of BAPCPA. Section 522(o), in pertinent part, states as follows:

> [T]he value of an interest in real or personal property that the debtor or a dependent
> of the debtor uses as a residence . . . or . . . claims as a homestead shall be reduced
> to the extent that such value is attributable to any portion of any property that the
> debtor disposed of in the 10-year period ending on the date of the filing of the
> petition with the intent to hinder, delay, or defraud a creditor and that the debtor
> could not exempt, or that portion that the debtor could not exempt, under subsection
> (b), if on such date the debtor had held the property so disposed of.

---

[17] Mr. Burks has since withdrawn as counsel of record for Ms. Sissom.  This Court signed an order to that effect on January 17, 2007.  [Docket No. 89.]  Ms. Sissom did not oppose the Motion to Withdraw.

Put another way, to prevail under § 522(o), four elements must be proven: (1) the debtor disposed of property within 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead, or, alternatively, to buy a new principal residence used by dependents of the debtor, improve an existing principal residence used by dependents of the debtor, or reduce the debt associated with a principal residence used by dependents of the debtor;[18] and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay, or defraud a creditor.

Pursuant to Bankruptcy Rule 4003(c), a trustee has the burden of proving that the debtor's exemptions are not properly claimed, and therefore must produce evidence which rebuts the prima facie effect of the claimed exemption. *Maronde*, 332 B.R. at 597; *In re Agnew*, 355 B.R. 276, 283 (Bankr. D. Kan. 2006). The appropriate standard of proof which the trustee must satisfy is a preponderance of the evidence. *In re Lacounte*, 342 B.R. 809, 813 (Bankr. D. Mont. 2005).

In the case at bar, the Trustee alleges in the Amended Objection that (1) the Debtor conveyed his 500 shares of F & S stock to Crown on February 13, 2006; (2) the F & S stock was nonexempt property; (3) some of the proceeds that Crown remitted to the Debtor were used to purchase the Bastrop Property, which the Debtor claims as his homestead, or alternatively, is the residence of the Debtor's dependents; and (4) the Debtor sold this stock with the intent to hinder, delay, or defraud one or more of his creditors.

---

[18] Section 522(o) applies to real or personal property that the debtor or a dependent of the debtor uses as a residence or claims as a homestead. In the case at bar, this Court is focused not only on the Debtor's claim of the Bastrop Property as his homestead, but also, even if this real property is not his homestead, on its use as a residence by two dependents of the Debtor, i.e., his two minor sons.

i.  **The Trustee has satisfied the first two elements: the Debtor disposed of nonexempt property within 10 years prior to filing this bankruptcy petition.**

The Debtor conveyed his 500 shares of F & S stock to Crown less than 90 days prior to filing his bankruptcy petition [Finding of Fact Nos. 5, 6], which is well within the 10-year look-back period. Under Texas law, stock constitutes nonexempt property. *In re Lee*, 309 B.R. at 474; *TransAmerican Natural Gas Corp. v. Finkelstein,* 905 S.W.2d 412, 416 (Tex. App.—San Antonio, 1995, pet. dism'd). Accordingly, the Trustee has satisfied the first two elements.

ii.  **The Trustee has satisfied the third element: some of the proceeds from the sale of the nonexempt F & S stock were used to purchase the Bastrop Property, which is the Debtor's homestead, or at a minimum, the principal residence of the Debtor's dependents.**

The Trustee has established the third element by proving that (a) some of the proceeds from the sale of the nonexempt F & S stock are traceable to the purchase of the Bastrop Property; and (b) the Bastrop Property qualifies as the Debtor's homestead or, alternatively, as the principal residence of the Debtor's dependents.

**a. Some of the proceeds from the sale of the nonexempt F & S stock are traceable to the purchase of the Bastrop Property.**

The Debtor, representing himself *pro se* at the hearing on the Amended Objection, seemed to suggest that the intermediate balance rule is applicable in this case and that its application somehow works in his favor.[19] To the extent that the Court interprets the Debtor's position correctly, the Court disagrees with the Debtor. The Court does not believe that the lowest intermediate balance

---

[19] The Debtor, as a *pro se* litigant, did not actually use the phrase "lowest intermediate balance rule." However, this Court translates the Debtor's layperson argument at the hearing into a rough approximation of the legal concept of the lowest intermediate balance rule.

rule applies; rather, general tracing rules apply.[20]   The $50,000.00 withdrawal from the Chase

Account on April 18, 2006 (used to help purchase the Bastrop Property) can be directly traced to the

deposit on April 13, 2006 of $50,000.00 from the proceeds of the F & S stock sale.[21]  Based on the

monthly statement of the Chase Account [Exhibit No. 20], the balance available on April 13, 2006,

the date when the $50,000.00 proceeds from the stock sale were deposited, was $4,540.82.  Thus,

after the $50,000.00 from the sale of the F & S stock had been deposited into the Chase Account,

the balance was $54,540.82.  Between April 13 and April 18, 2006, the lowest balance of the Chase

account was $53,563.69.  Therefore, when Ms. Sissom withdrew $50,000.00 on April 18, 2006, none

of the stock sale proceeds had been depleted and all of the $50,000.00 can be traced to the deposit

on April 13, 2006.  The April 18, 2006 withdrawal was used to help purchase the Bastrop Property

because Ms. Sissom used these funds to purchase a $50,000.00 cashier's check and then sent this

check to Independence Title, the Austin title company which held the closing on the Bastrop

Property.  [Finding of Fact Nos. 13, 14, 17, 18.]  Since this cashier's check can be traced directly

back to the sale of the nonexempt F & S stock, and not to the exempt proceeds from the sale of the

Missouri City Property as the Debtor alleges, the Trustee has satisfied the first part of the third

element.

---

[20] For a detailed discussion of the lowest intermediate balance rule, see *In re Martin*, 25 BR 25, 28 (Bankr. N.D. Tex. 1982) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)).  On the facts in the case at bar, however, the Court need not invoke the lowest intermediate balance rule.  The Debtor never reduced the balance of the Chase Account below the relevant amounts deposited, nor did he deposit any other monies besides the two amounts being traced (the $3,000.00 earnest money and the $50,000.00 from the sale of the F & S stock).  *See* Appendices A and B.  Therefore, the Court need only apply the general principles of tracing.

[21] Attached to this Memorandum Opinion as Appendix A is a chart reflecting the deposits and withdrawals relating to this account, including the $50,000.00 deposit made on April 13, 2006.  This chart is taken from the monthly statement of the Chase Account.  [Exhibit No. 20.]

**b. The Bastrop Property qualifies as the Debtor's homestead or, alternatively, as the principal residence of the Debtor's dependents**

The Trustee has also shown that the Bastrop Property is the Debtor's homestead or, in the alternative, the principal residence of the Debtor's dependents. Although the record reflects that Ms. Sissom presently resides at the Bastrop Property with her and the Debtor's two minor children [Finding of Fact No. 41], while the Debtor presently resides in Houston [Finding of Fact No. 42], their living apart does not mean that the Bastrop Property may not be the Debtor's homestead.

Under Texas law, the Debtor does not have to presently reside at the Bastrop Property to claim it as his homestead. *Schulz v. L.E. Whitman & Co.*, 27 S.W.2d 1093, 1094 (Tex. 1930) ("[T]he rule is fixed in this State that the homestead right may attach although the wife may never move upon the property; that it becomes the homestead from the time of its dedication as such by the head of the family.") (citations omitted). Admittedly, there is nothing in the record to reflect when, or if, the Debtor plans to move to the Bastrop Property.[22] Nevertheless, the Debtor has claimed the Bastrop Property as his homestead [Finding of Fact No. 32], and the Trustee does not per se object to the Debtor's exemption of this real property; rather, the Trustee only objects to the value attributable to the use of nonexempt proceeds to facilitate the purchase of this property. Because the Trustee does not object to the Debtor exempting the Bastrop Property as his homestead per se, and because no other creditor or party-in-interest has timely lodged an objection, the Bastrop Property is deemed to be the Debtor's homestead. 11 U.S.C. § 522 (l) ("Unless a party in interest objects, the

---

[22] There is some evidence that the Debtor and Ms. Sissom were having marital problems. Indeed, the record reflects that a few weeks after they sold the Missouri City Property Ms. Sissom moved to the Bastrop Property with the two minor sons while the Debtor remained in Houston. [Finding of Fact Nos. 41, 42.] Nevertheless, the Debtor and Ms. Sissom have never divorced. There is some communication between the Debtor and his first attorney, Barbara Rogers, to the effect that divorce proceedings were about to occur [Exhibit Nos. 68-B, 68-O], but the Debtor gave no testimony that he actually filed a divorce petition.

property claimed as exempt on such list is exempt."); *In re Sadkin*, 36 F.3d 473, 477 (5th Cir. 1994) (citing Bankruptcy Rule 4003(b) and the Supreme Court's decision in *Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992), in holding that the debtor's claimed exemption, even if wholly without merit and devoid of a statutory basis, was nevertheless allowable because the objecting party did not file an objection until well past the thirty-day deadline of Rule 4003(b)).

Even if this Court is incorrect that the Bastrop Property is the Debtor's homestead, the record is clear that the Debtor's two minor sons reside with their mother at the Bastrop Property. [Finding of Fact No. 41.] Accordingly, the Bastrop Property is the residence of two dependents of the Debtor, thereby satisfying the alternate second prong of the third element.[23] Thus, the Trustee has satisfied the third element.

### iii.    Existing case law interpreting and applying the fourth element of § 522(o)

The key is whether the Trustee can satisfy the fourth element, which is the most difficult to establish because of the need to prove that the Debtor disposed of the F & S stock "with the intent to hinder, delay, or defraud a creditor." A review of the few cases that have interpreted this phrase in the context of § 522(o) indicates that the Trustee has also satisfied this element.

Three bankruptcy courts have already issued rulings under this new statute in response to trustees' objections to homestead exemptions claimed by debtors. *Agnew*, 355 B.R. 276; *Lacounte*, 342 B.R. 809; *Maronde*, 332 B.R. 593. In adjudicating the objections lodged by the trustees, all or some of these courts made the following legal conclusions with which this Court concurs:

---

[23] The Debtor's two minor sons and their mother (i.e., Ms. Sissom) actually moved to the Bastrop Property after the filing of the Debtor's Chapter 7 petition. This Court believes that in determining whether certain real property is the residence of dependents of a debtor for purposes of § 522(o), this Court may look to events that have occurred after the filing of the petition. *See In re Cortez*, 457 F.3d 448, 459 (5th Cir. 2006) (holding that a bankruptcy court, when ruling on a motion to dismiss under § 707, should consider post-petition events).

1.  The phrase "with the intent to hinder, delay, or defraud a creditor" contained in § 522(o) is a term of art that is not defined in the Bankruptcy Code, and Congress gave no guidance regarding the construction of this phrase. *Agnew*, 355 B.R. at 284; *Lacounte*, 342 B.R. at 814; *Maronde*, 332 B.R. at 599.

2.  Section 727(a)(2) of the Code also contains the phrase "with the intent to hinder, delay, or defraud a creditor," and § 548(a)(1)(A) contains very similar language, namely, "with actual intent to hinder, delay, or defraud any entity." Therefore, in interpreting the meaning of the phrase as contained in § 522(o), it is appropriate to look to case law interpreting the language of these two other statutes. *Agnew*, 355 B.R. at 284; *Lacounte*, 342 B.R. at 814; *Maronde* 332 B.R. at 599.

3.  Proving a debtor's "actual intent to hinder, delay, or defraud" under §§ 727 and 548 by evidence of wrongful intent is rarely done by direct testimony, but rather is typically established by inference from specific indicia of fraud based upon all of the facts and circumstances. *Agnew*, 355 B.R. at 284-85; *Lacounte*, 342 B.R. at 815; *Maronde* 332 B.R. at 600. These courts have turned to the fraudulent transfer acts of their respective states as a starting point for examining these indicia—sometimes referred to as badges of fraud. This Court therefore turns to the Texas Uniform Fraudulent Transfer Act (TUFTA), TEX. BUS. & COM. CODE ANN. § 24.001 *et seq.* (Vernon 2006), for determining whether there are badges of fraud present in the case at bar. Additionally, because TUFTA expressly states that its list of badges is non-exhaustive, this Court also looks to certain indicia focused on by the three other bankruptcy courts that have interpreted § 522(o). The indicia this Court considers

24

in determining whether the Debtor intended to hinder, delay, or defraud are as follows:

a.      The transfer or obligation was to an insider. TEX. BUS. & COM. CODE ANN. § 24.005(b)(1); *Maronde*, 332 B.R. at 600.

b.      The Debtor retained possession or control of the property after the transfer. TEX. BUS. & COM. CODE ANN. § 24.005(b)(2); *Maronde*, 332 B.R. at 600.

c.      The transfer or obligation was concealed. TEX. BUS. & COM. CODE ANN. § 24.005(b)(3); *Maronde*, 332 B.R. at 600.

d.      Before the transfer was made or obligation incurred, the Debtor had been sued or threatened with suit. TEX. BUS. & COM. CODE ANN. § 24.005(b)(4); *Maronde*, 332 B.R. at 600.

e.      The transfer was of substantially all the Debtor's assets. TEX. BUS. & COM. CODE ANN. § 24.005(b)(5); *Maronde*, 332 B.R. at 600.

f.      The Debtor absconded—i.e., avoided service of process and/or concealed himself. TEX. BUS. & COM. CODE ANN. § 24.005(b)(6); *Maronde*, 332 B.R. at 600.

g.      The Debtor removed or concealed assets. TEX. BUS. & COM. CODE ANN. § 24.005(b)(7); *Maronde*, 332 B.R. at 600.

h.      The value of the consideration received by the Debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. TEX. BUS. & COM. CODE ANN. § 24.005(b)(8); *Maronde*, 332 B.R. at 600.

i.      The Debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.  TEX. BUS. & COM. CODE ANN. § 24.005(b)(9);  *Maronde*, 332 B.R. at 600.

j.      The transfer occurred shortly before or shortly after a substantial debt was incurred.  TEX. BUS. & COM. CODE ANN. § 24.005(b)(10); *Maronde*, 332 B.R. at 600.; *Agnew*, 355 B.R. at 285.

k.      The transfer was done just prior to the filing of the Debtor's bankruptcy petition. *Lacounte*, 342 B.R. at 816.

l.      The Debtor is unable to explain the disappearance of assets. *Id.* at 815.

m.      The Debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy.[24]
        *Agnew*, 355 B.R. at 285.

### C.      The evidence reflects that eleven of the thirteen badges of fraud are present in this case.

####     i.      The transfer was to an insider.

In the case at bar, the Debtor sold his 500 shares of F & S stock to Crown (a non-insider), and Crown remitted, directly or indirectly, at least $225,100.00 to the Debtor, who immediately gave $189,740.00 to his wife, an insider pursuant to 11 U.S.C. § 101(31). [Finding of Fact Nos. 5, 6, 7.] Ms. Sissom then used $50,000.00 of these monies to purchase the Bastrop Property [Finding of Fact Nos. 13, 14, 16, 17, 18, 20], which the Debtor subsequently claimed as his exempt homestead.[25]

---

[24] TUFTA makes no reference to these final three badges of fraud.  However, the courts considering § 522(o) have focused on these issues, and this Court believes that it is appropriate to consider these particular badges of fraud.

[25] Ms. Sissom testified that the Bastrop Property is in her name only and that she alone owns this property.  This testimony contradicts both the amended Schedules—in which the Debtor claims to have an interest in this property—and the loan application which Ms. Sissom herself completed to obtain financing to purchase the Bastrop Property.  In the loan application, Ms. Sissom set forth that the Bastrop Property would be titled in both her husband's name and her own

[Finding of Fact No. 32.]  There is no legally relevant distinction between the Debtor giving his wife the stock first and her selling it, and the Debtor selling the stock and giving his wife the proceeds. Because Ms. Sissom is an "insider" pursuant to 11 U.S.C. § 101(31), the transfer was to an insider; therefore, this first badge of fraud is satisfied.

### ii.    The Debtor retained possession or control of the property after the transfer.

The written agreement between the Debtor and Crown sets forth that the Debtor had a 90-day option to repurchase the 500 shares of F & S.  [Finding of Fact No. 5.]  This provision was insufficient to give the Debtor possession or control of the stock after the shares were transferred to Crown on February 13, 2006.  Thus, this badge of fraud is not present in the case at bar.

### iii.    The transfer was concealed.

In his original SOFA, the Debtor failed to disclose either the sale of the F & S stock or the use of $50,000.00 of the sale proceeds to facilitate the purchase of the Bastrop Property.  [Finding of Fact No. 27.]  By contrast, in his original SOFA, the Debtor represented that in April 2006, he sold his homestead, which he identified as the Missouri City Property.  [Finding of Fact No. 27.] The purchase of the Bastrop Property was accomplished only a few days prior to the sale of the Missouri City Property.  [Finding of Fact Nos. 18, 21.]  It strains credulity to believe that the Debtor failed to disclose the sale of the F & S stock and the use of $50,000.00 of the sale proceeds to help purchase the Bastrop Property due to poor memory or mere oversight.  Indeed, at the hearing, the Debtor testified that the purchase of the Bastrop Property could not have occurred without using

_____

name. [Finding of Fact No. 16.]   Moreover, as a matter of law, the Debtor has a community interest in the Bastrop Property because this real estate was purchased with community funds during his marriage with Ms. Sissom. *Knott*, 118 S.W.3d at 902; *Evans*, 14 S.W.3d at 346.

proceeds from the sale of the Missouri City Property. The Court does not believe one word of this testimony because chronologically, it is impossible.[26] However, the Debtor unequivocally testified that one transaction could not occur without the other, leaving this Court to wonder how the Debtor could schedule the Missouri County Property, but not the Bastrop Property, in his initial Schedules. Given his adamant testimony, this Court can draw no other conclusion than that the Debtor, in his initial Schedules, deliberately omitted the sale of his F & S stock and the use of $50,000.00 of the proceeds to facilitate the purchase of the Bastrop Property. Thus, the third badge of fraud is present in this case.

### iv.   Before the transfer was made, the debtor had been sued or threatened with suit.

Royal Oaks Bank filed the State Court Lawsuit on March 10, 2006, approximately 10 days after the bank's counsel had sent a letter to the Debtor threatening to file suit to collect the indebtedness that the Debtor had guaranteed. [Finding of Fact No. 10.] The Debtor's sale of the F & S stock occurred on February 13, 2006. [Finding of Fact No. 6.] Hence, the transfer in the case at bar was made just prior to the Debtor being threatened with a suit and actually being sued. Accordingly, this badge of fraud is not present in the case at bar.

### v.   The Debtor absconded—i.e., avoided service of process and/or concealed himself.

---

[26] There is no question that the closing on the purchase of the Bastrop Property occurred on April 21, 2006 [Finding of Fact No. 18], whereas the sale of the Missouri City Property occurred on April 24, 2006 [Finding of Fact No. 21]. Accordingly, there is no way that the Debtor and his wife could have used monies from the sale of their Missouri City Property to purchase the Bastrop Property. Indeed, it was not until April 24, 2006 that the Perezes wire transferred the sums of $145,440.86 and $19,132.36, respectively, to pay off the two liens on the Missouri City Property, and also wire transferred the remaining $75,426.78 to the Chase Account (representing the equity that the Sissoms had in the Missouri City Property). [Finding of Fact No. 21.]

As the Debtor's first counsel, Barbara Rogers, testified, and some of the exhibits reflect, the Debtor was extremely difficult to locate at various times.  Ms. Rogers testified that she appeared at a continued meeting of creditors, but the Debtor did not appear even though she had repeatedly left messages for him to attend.  A letter Ms. Rogers sent to the Debtor on June 22, 2006 illustrates this point:

> Dear Jimmy:
>
> Your reset 341 meeting was yesterday morning at 9:30 a.m.  I was there, the Trustee was there and Bank counsel and Bank representative were there, but you were not there.  The Trustee reset the meeting to July 5, 2006 at 9:30 a.m. to give me an opportunity to find you if possible and get you there.
>
> If you do not show up on July 5, 2006, then the Trustee will ask the Court for an order instructing the U.S. Marshalls [sic] to find you and bring you in to a creditors' meeting.  That is not what you want to happen.  I have tried to reach you on the cell phone number that you left on my voicemail a couple of weeks ago (832-496-5921) but I never got an answer and the messages are full.
>
> I will expect to see you on July 5, 2006 at 9:30 a.m. on the 3rd floor of the U.S. Courthouse, 515 Rusk, Houston, TX.  If you have any questions call me.
>
> Sincerely,
> /s/ Barbara M. Rogers

[Exhibit No. 68-J.]

Indeed, Ms. Rogers had so much trouble locating the Debtor that in an email sent to the Debtor on August 17, 2006, she stated "I am definitely not representing you any more.  It is impossible to get in touch with you."  [Exhibit No. 68-R.]  Ms. Rogers' communications and testimony establish the existence of this fifth badge of fraud in the case at bar.

### vi.   The Debtor removed or concealed assets.

In his initial Schedules, the Debtor failed to disclose the sale of his F & S Stock and the purchase of the Bastrop Property.  [Finding of Fact No. 27.]  Moreover, the Debtor failed, and

continues to fail, to disclose where some of the remaining proceeds from the sale of the F & S stock have gone. [Finding of Fact Nos. 28-30.] The Court concludes that the Debtor has concealed assets. Thus, this sixth badge of fraud is present in this case.

### vii. The value of the consideration received by the Debtor was not reasonably equivalent to the value of the asset transferred.

In his initial Schedule B, the Debtor represented that the value of his F & S Stock was $900,000.00. [Finding of Fact Nos. 27, 31.] Subsequently, he amended his Schedule B to represent that the value of his F & S stock was $2.8 million. [Finding of Fact No. 32.] Yet, he disposed of his F & S stock in exchange for $225,100.00. [Finding of Fact No. 6.] Based on the two values he assigned under oath to this stock, the Debtor received either 25% or 8% of its value.[27] In either case, he received less than reasonably equivalent value. Therefore, this seventh badge of fraud is present in this case.

### viii. The Debtor was insolvent or became insolvent shortly after the transfer was made.

The sale of the F & S stock occurred on February 13, 2006. This Court believes that the Debtor was insolvent on that date, or became insolvent thereafter. In coming to this conclusion, the Court looks to the various amended Schedules that the Debtor filed. Although the Debtor's version of his assets and liabilities varies greatly from one schedule to the next—from a negative net worth of $665,749.09 to a positive net worth of $2,855,586.01—the facts, as adduced at the hearing and through the introduction of exhibits, even viewed in the light the most favorable to the Debtor, can

---

[27] As a matter of law, the Debtor cannot deny these values which he included in his Schedules. *In re Jacobson*, No. 04-51572-RBK, 2006 U.S. Dist. LEXIS 70433, at *54 (W.D. Tex. Sept. 26, 2006) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions . . . . A judicial admission is binding on the party making it and judicial admission may not be explained or controverted.")

only lead this Court to conclude that the Debtor was insolvent at the time of the transfer.  A chart summarizing the assets and liabilities in the original Schedules and five amended Schedules is attached to this Opinion as Appendix C.  This chart reflects the wildly varying financial condition that the Debtor has represented himself to be in—going from solvency on one day to extreme insolvency the next and back to solvency thereafter, and ending with severe insolvency.  A detailed analysis of each schedule follows.

In his original Schedules of May 3, 2006, the Debtor represented that his total assets were $1,293,495.00 and his total liabilities were $1,059,244.09 [Finding of Fact No. 27]—thereby indicating that he was solvent in the amount of $234,250.91.  However, the Debtor was not actually solvent because this asset figure included the value of the F & S stock which he had sold on February 13, 2006.

On August 17, 2006 the Debtor amended his Schedule B to delete any reference to ownership of F & S stock [Finding of Fact No. 31].  Because the Debtor had valued the F & S stock at $900,000.00 in his original Schedule B, the August 17 amendments reduced his total assets to $393,495.00, and because he did not amend any Schedules regarding liabilities on August 17, 2006, the resulting calculation reflects that he was insolvent in the amount of $665,749.09.[28]

In his amended Schedules of August 29, 2006, the Debtor represented to this Court that his total assets were $3,748,961.59 and that his total liabilities were $893,375.58 [Finding of Fact No. 32]—resulting in a positive net worth of $2,855,586.01.  The Debtor would have this Court believe

---

[28] Whether the Debtor was solvent is determined by assessing whether total assets exceeded total liabilities, exclusive of the property that was transferred and property that may be exempted.  11 U.S.C. § 101(32)(A).  *In re Schumann*, No. 03-50398-RLJ-7, 2004 Bankr. LEXIS 819, at *13 (Bankr. N.D. Tex. Jun. 18, 2004); *In re Sullivan*, 161 B.R. 776, 782 (Bankr. N.D. Tex. 1993).  The Debtor's negative net worth of $665,749.09 does not even take into account any exempt property; if exempt property is excluded, then the Debtor's negative net worth would be even higher than $665,749.09.

that he went from being insolvent on August 17, 2006 in the amount of $665,749.09 to being solvent on August 29, 2006 in the amount of $2,855,586.01. The Court finds the Debtor's numbers from his August 29, 2006 Schedules to be patently ludicrous. In particular, the Court notes that for some inexplicable reason, the Debtor—although he sold the F & S stock on February 13, 2006 and had deleted it as an asset in his amended Schedule B filed just twelve days prior—decided to reinsert the F & S stock in his amended Schedule B. [*Id.*] But instead of valuing this stock at $900,000.00—as in his original Schedule B—he valued it at $2,800,000.00. [*Id.*]

Additionally, and equally inexplicable, instead of representing to this Court that he owned 100% of F & S—as he did in his original Schedule B—the Debtor represented that he owned only 50% of F & S. [*Id.*] That is, he wants this Court to believe that all outstanding shares of F & S were worth $5,600,000.00. The Court declines to accept the accuracy of these numbers, not only because of the Debtor's poor credibility, but also because he failed to offer any proof from an independent third party about the value of these shares. Moreover, because the Debtor sold these shares prior to filing his bankruptcy petition, the Debtor's August 29, 2006 figure of $2,800,000.00 must be deducted from the total asset figure of $3,748,961.59—thereby resulting in a total asset amount of $948,961.59.

Even if this figure of $948,961.59 is accurate—and the Court doubts it is given the Debtor's utter lack of credibility—the Debtor was insolvent as of August 29, 2006 because his total liability figure of $893,375.58 was too low by $695,085.00. Specifically, the Debtor did not include his $695,085.00 debt to Royal Oaks Bank which appeared in his original Schedule F, but somehow

disappeared in his amended Schedule F of August 29, 2006.[29] [Finding of Fact Nos. 27, 32.] If this debt was included—as it should have been—in the liabilities set forth in the August 29, 2006 amended Schedule F, the Debtor's total liabilities would have been $1,588,460.58. Subtracting total liabilities of $1,588,460.58 from total assets of $948,961.59 renders the Debtor insolvent in the amount of $639,498.99.

The Debtor's September 8, 2006 amended Schedules reflected total assets of $998,961.59 and total liabilities of $1,374,290.58. [Finding of Fact No. 33.] Once again, the Debtor deleted any reference to ownership in F & S, removing the $2,800,000.00 in assets attributable to F & S stock that had been included in his August 29, 2006 amendments. Thus, one week after representing to this Court that he was solvent in the amount of $2,855,586.01, the Debtor reversed course yet again and represented to this Court that he really was insolvent in the amount of $375,328.99.

However, just four days later, when the Debtor filed more amendments on September 12, 2006—now representing that he owned two receivables totaling $410,000.00—the Debtor represented to this Court that he was solvent in the amount of $34,671.01. [Finding of Fact No. 34.]

On November 8, 2006, the Debtor filed—mercifully, for the last time—further amendments. By these amendments the Debtor represented that his total assets were $700,557.95 and his total liabilities were $1,313,842.58. Thus, in his most recently amended Schedules, the Debtor represented to this Court that he was insolvent in the amount of $613,284.63. [Finding of Fact No. 36.]

---

[29] In his amended Schedules F of September 8, 2006 and October 16, 2006, the Debtor scheduled this debt as $696,000.00, as opposed to the amount of $695,085.00 in his original Schedule F. Were the Debtor's other amendments and mistakes similarly of such a *de minimis* amount, the Debtor might have retained more credibility.

By executing the numerous Schedules that he filed under penalty of perjury—particularly the amended Schedules, which were filed after the Trustee began asking questions about issues not addressed in the initial Schedules—the Debtor represented to this Court that these values were accurate; therefore, he is estopped from denying their accuracy. *Jacobson*, 2006 U.S. Dist. LEXIS 70433, at *54 ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions . . . . A judicial admission is binding on the party making it and judicial admission may not be explained or controverted."); *Larson v. Groos Bank, N.A.*, 204 B.R. 500, 501 (W.D. Tex. 1996) ("Specifically, statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions.") The Court would also note that during the hearing, the Debtor testified that he was in serious financial straits at or about the time he sold the F & S stock. Considering all of these circumstances, this Court concludes that the Debtor was insolvent at the time of the sale of the F & S stock or, in the alternative, the sale of the F & S stock caused him to be insolvent. This eighth badge of fraud is therefore present in this case.

### ix.    The transfer was of substantially all the Debtor's assets.

As noted above, in his initial Schedules, the Debtor represented that he owned 100% of the F & S stock and that the value of his interest was $900,000.00. [Finding of Fact No. 27.] On August 29, 2006, the Debtor represented to this Court in his amended Schedules that he owned 50% of the F & S stock, and that his ownership interest had a current market value of $2,800,000.00. [Finding of Fact No. 32.] If either of the Debtor's valuations is accepted, then the sale of the F & S stock on

34

February 13, 2006 was unquestionably a sale of substantially all of the Debtor's assets.[30] This Court has serious doubts that the Debtor's values are accurate, but the Debtor himself is estopped from denying their accuracy. *Id.* Accordingly, selling the F & S stock was a transfer of substantially all of the Debtor's assets. Thus, this ninth badge of fraud is present in this case.

### x.   The transfer occurred shortly before or shortly after a substantial debt was incurred.

The transaction involving the Debtor's sale of the 500 shares of F & S stock to Crown included a loan from Crown to the Debtor in the amount of $50,000.00. [Finding of Fact Nos. 5, 6.] Thus, the Debtor borrowed $50,000.00 on February 13, 2006—less than 90 days prior to the filing of the Debtor's Chapter 7 petition. Insofar as the Debtor was, by his own testimony, in dire financial straits at this time, a $50,000.00 debt qualifies as substantial.

Moreover, the Debtor incurred a second debt soon after he sold the F & S stock. Specifically, on April 20, 2006, the Debtor's wife signed a $241,792.00 promissory note in order to purchase the Bastrop Property. [Finding of Fact No. 16.] Although only Ms. Sissom signed this note, the Debtor is also liable for this obligation, both because the debt was incurred during their marriage and because it is secured by what the Debtor now claims is his homestead. TEX FAM. CODE ANN. § 3.003(a) (Vernon 2006); *Cockerham v. Cockerham*, 527 S.W. 2d 162, 171 (Tex. 1975); *Kimsey v. Kimsey*, 965 S.W.2d 690, 702 (Tex. App.—El Paso 1998, pet. denied).

---

[30] If the Debtor's initial schedules are to be believed, then the value of the Debtor's interest in the F & S stock is approximately 70% of his total assets ($900,000/$1,293,495 is approximately 70%). On the other hand, if the Debtor's amended schedules of August 29, 2006 are to be believed, then the value of the Debtor's interest in F & S is approximately 75% of his total assets ($2,800,000/$3,748,961 is approximately 75%). Under either scenario, it is clear that the sale of the F & S stock was a sale of substantially all of the Debtor's assets. *See In re Wright*, 353 B.R. 627, 652 (Bankr. E.D. Ark. 2006) (finding this badge of fraud present in an asset transfer of approximately 30% of the debtor's total assets); *In re Knippen*, 355 B.R. 710, 735 (Bankr. N.D. Ill. 2006) (finding this badge of fraud present in an asset transfer of approximately 77% of the debtor's total assets).

In his original Schedules and his Amended Schedules, the Debtor sets forth various aggregate debt figures, ranging from a low of $810,159.09 to a high of $1,374,290.58. This Court is skeptical of the accuracy of any of the figures set forth in the Debtor's Schedules. However, $291,792.00, which is the sum of $50,000.00 (the loan from Crown) and $241,792.00 (the loan from AWL), is approximately 36% of $810,159.09, and approximately 21% of $1,374,290.58.[31] Under either scenario, the indebtedness incurred by the Debtor was substantial, particularly in view of his own testimony that he was in dire financial straits at this time. This tenth badge of fraud is therefore present in this case.

### xi.   The transfer was done just prior to the filing of the Debtor's bankruptcy petition.

The Debtor sold his 500 shares of F & S stock to Crown on February 13, 2006 [Finding of Fact Nos. 5, 6]—less than 90 days prior to the filing of his Chapter 7 petition. *Lacounte*, 342 B.R. at 812-13, 816 (holding that a transfer made more than three months before filing constitutes a transfer just prior to the filing). Therefore, the eleventh badge of fraud is present in this case.

### xii.   The Debtor is unable to explain the disappearance of assets.

To this day, the Debtor has failed to explain the disappearance of certain assets. On February 13, 2006, the Debtor received, either directly or indirectly, $225,100.00 in cash from Crown as part of the transaction involving the sale of the Debtor's F & S stock: $189,740.00 remitted directly to the Debtor and another $35,360.00 sent to DMGI, a company owned by the Debtor. [Finding of Fact Nos. 5, 6.] On the same day that the Debtor received the $189,740.00, he used these funds to obtain four cashier's checks—each payable to Ms. Sissom—in the amounts of $39,740.00, $50,000.00,

---

[31] None of the total liability figures that the Debtor provided in his Schedules included the loan from Crown or the promissory note on the Bastrop Property.

$50,000.00, and $50,000.00, respectively. [Finding of Fact No. 7.] He then delivered these checks to his wife. [Finding of Fact No. 7.]

On March 9, 2006, Ms. Sissom deposited the $39,740.00 check into DMGI's account [Finding of Fact No. 8]; and then, on March 24, 2006, deposited one of the $50,000.00 checks into DMGI's account. [Finding of Fact No. 9.] On April 13, 2006, she deposited the second $50,000.00 check into the Chase Account [Finding of Fact No. 13], and then on April 18, 2006, she obtained a $50,000.00 cashier's check from this same account and remitted these funds to Independence Title Company to effectuate the purchase of the Bastrop Property. [Finding of Fact No. 14.] Finally, on May 18, 2006, Ms. Sissom used the third $50,000.00 check to purchase three separate cashier's checks: one check in the amount of $20,000.00 made payable to Carz N More; a second check in the amount of $15,000.00 made payable to herself; and a third check in the amount of $15,000.00 made payable to herself. [Finding of Fact No. 28.] On May 22, 2006, Ms. Sissom used one of the $15,000.00 checks to purchase a cashier's check in the same amount made payable to Buttross Properties. [Finding of Fact No. 29.]

Neither the Debtor nor Ms. Sissom has made any disclosure or given any explanation about Buttross Properties or what became of the $15,000.00 paid to it. Moreover, on May 25, 2006, Ms. Sissom used the second of the $15,000.00 checks to purchase a cashier's check in the same amount made payable to herself. [Finding of Fact No. 30.] Neither the Debtor nor Ms. Sissom has made any disclosure as to the disposition of these monies either. Nor have the Debtor or Ms. Sissom explained

why $20,000.00 was paid to Carz N More. Thus, as of this date, $50,000.00 of the $189,740.00 that the Debtor received from Crown remains unaccounted for or unexplained.[32]

Further, the Debtor and Ms. Sissom received monies from the sale of the Missouri City Property which have since disappeared. On April 24, 2006, the Perezes, who purchased the Missouri City Property, wire transferred the sum of $75,426.78 to the Chase Account. [Finding of Fact No. 21.] Two days later, on April 26, 2006, Ms. Sissom obtained a cashier's check for $70,426.78 [Finding of Fact No. 22], and then used these monies on May 1, 2006 to purchase a cashier's check in the amount of $63,049.01, with the other $7,377.77 disappearing. [Finding of Fact No. 24.] As of today, neither the Debtor nor Ms. Sissom has disclosed what happened to the $63,049.01 cashier's check or the remaining $7,377.77.

Thus, as of the date of this Opinion, $50,000.00 from the sale of the F & S stock as well as $70,426.78 from the sale of the Missouri City Property has vanished. The Debtor's failure to explain where these dollars have gone constitutes a badge of fraud. This badge is particularly

---

[32]The Court wants to emphasize that this conclusion in no way suggests that the other $139,740.00 was expended properly. The Court merely wants to make clear that as of today, the Debtor has failed to explain where this particular $50,000.00 has gone.

egregious here because these are substantial dollars that are nonexempt property.[33]  Therefore, this

twelfth badge of fraud is present in this case.

### xiii.   The Debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy.[34]

To say that the Debtor has engaged in a pattern of sharp dealing prior to bankruptcy would

be an understatement.  The Debtor sold nonexempt property—his 500 shares of F & S stock—for

$225,100.00, and then obtained four separate cashier's checks made payable to his wife, in the

aggregate amount of $189,740.00.  [Finding of Fact Nos. 5, 6.]  He delivered these checks to his

wife, who held them for at least three weeks, and in some instances for three months, before using

these monies for either her own benefit, the benefit of both her and her husband, or the benefit of

entities (such as DMGI) in which her husband and she had an interest by virtue of the fact that the

---

[33] There is no question that the Missouri City Property was the homestead of the Debtor and Ms. Sissom.  There is also no question that under Texas law, they could have used the proceeds from the sale of the Missouri City Property to purchase another homestead which they could legitimately claim as exempt property.  TEX. PROP. CODE ANN. § 41.001(c) (Vernon 2006).  Indeed, under Texas law, the proceeds from the sale of the Missouri City Property were exempt for six months, as the public policy is that any husband and wife should have sufficient time to look for and purchase another homestead with the proceeds from the sale of the homestead that they have sold.  *Id.*; *Davis v. Davis (In Re Davis)*, 170 F.3d 475, 483 (5th Cir. 1999); *Jones v. Maroney*, 619 S.W. 2d 296, 297 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ) (quoting *Gaddy v. First Nat'l Bank of Beaumont*, 283 S.W. 277, 280 (Tex. Civ. App.—Beaumont 1926, no writ)).  However, the Sissoms never used the proceeds from the sale of the Missouri City Property to purchase another homestead.  [Finding of Fact No. 25.]  The Debtor's testimony that the proceeds from the Missouri City Property were used to purchase the Bastrop Property is patently false because it was chronologically impossible.  *See supra* note 26.  Thus, by October 24, 2006—i.e., the six-month anniversary of the sale of the Missouri City Property—the proceeds from the sale of this property became nonexempt property which the Debtor should have turned over to the Trustee.  *In re Zibman*, 268 F.3d 298, 304 (5th Cir. 2001) ("When the [debtors] failed to invest the proceeds from the sale of their Houston homestead in another Texas homestead within the allotted time, the exemption on these proceeds evanesced by operation of law.  Allowing the intervening bankruptcy petition to improve the [debtors'] pre-petition exemption by expurgating the 6-month clock and thereby freezing the exemption permanently would not only require a fragmented reading of state law, but would contravene the purpose of the exemption, transforming it into a protection of the proceeds, in and of themselves.  This we refuse to do.")

[34] Black's Law Dictionary does not specifically define "sharp dealing," but it defines "sharp practice" as "Unethical action and trickery, esp. by a lawyer," and further notes that the term has the archaic meaning of "unhandsome dealing."  BLACK'S LAW DICTIONARY 1381(7th ed. 1999).  Webster's Dictionary defines "sharp practice" as "the act of dealing in which advantage is taken or sought unscrupulously."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1074 (10th ed. 2001).

ownership of these entities constituted community property. [Finding of Fact Nos. 7, 8, 9, 13, 14, 17, 18, 28, 29, 30.] Further, the Debtor, together with his wife, sold their Missouri City Property [Finding of Fact Nos. 12, 19, 21], and Ms. Sissom then obtained a cashier's check for $70,426.78, representing most of the equity in this property [Finding of Fact No. 22], all of which funds disappeared thereafter. To add insult to injury, the Debtor did not disclose any of these transactions in his initial Schedules and SOFA, and to the extent that he subsequently amended his Schedules and SOFA to make disclosures, he did so only after the Trustee unearthed information about the above-described activity and requested that the Debtor file amendments regarding this activity.

The Debtor and his wife have also failed to fully explain the source of the $11,540.99 cashier's check that Ms. Sissom obtained on April 19, 2006. [Finding of Fact No. 15.] There is no question that she withdrew $2,540.99 from the Chase Account to help her purchase the $11,540.99 cashier's check. However, neither the Debtor nor Ms. Sissom have disclosed where she obtained the other $9,000.00. There is no question that the Chase Account contained funds which were community property and therefore must be accounted for as property of the Debtor's bankruptcy estate. Whether the other $9,000.00 is community property remains to be determined, but can only be done so with the cooperation of the Debtor and his wife, and such assistance has not been forthcoming.

In sum, the Debtor has engaged in a pattern of "sharp dealing," and the thirteenth badge of fraud is therefore present.

### Summary: eleven of the thirteen badges of fraud are present in this case.

All in all, the Trustee has established that there are eleven badges of fraud present in this case. By so establishing, the Trustee has met his burden of proof in showing that the Debtor

disposed of his F & S stock with the intent to hinder, delay, or defraud a creditor; therefore, the fourth element of § 522(o) is satisfied. Because all elements of 11 U.S.C. § 522(o) are met, the Debtor is not entitled to exempt the value of the Bastrop Property to the extent that nonexempt proceeds were used to purchase this real estate, and the Trustee is entitled to recover the amount of proceeds from the sale of the F & S stock used to purchase the Bastrop Property.

The Trustee has proven that the amount of $50,000.00 of nonexempt proceeds were used to purchase the Bastrop Property. As already discussed, this is the $50,000.00 that is traceable from the sale of the F & S stock, into the Chase Account, and finally to the cashier's check sent by Ms. Sissom to Independence Title Company. [Finding of Fact Nos. 13, 14, 17.]

**D.     The Debtor's Failed Defenses**

   **i.     According to the Debtor, the nonexempt funds were converted into exempt funds when commingled in the Chase Account with other exempt funds.**

On April 11, 2006, the Perezes gave a $3,000.00 earnest money check to the Debtor and Ms. Sissom, and on April 12, 2006, this $3,000.00 check was deposited into the Chase Account.[35] [Finding of Fact No. 12.] Under Texas law, the $3,000.00 at that time was exempt property because these funds were paid pursuant to a contract to sell the homestead of the Debtor and Ms. Sissom. TEX. PROP. CODE ANN. § 41.001(c) (Vernon 2006). At the hearing on the Amended Objection, the Debtor, who by this time was representing himself pro se,[36] seemed to be arguing, incredibly, that

---

[35] Immediately before the $3,000.00 deposit, the Chase Account held community funds totaling $3,928.23, all of which constituted nonexempt community property. [Exhibit No. 20.] *See* Appendix A for further details on the deposits and withdrawals relating to the Chase Account.

[36] Barbara Rogers, the Debtor's initial counsel in this case, withdrew from representing the Debtor on August 25, 2006, with this Court's permission and without opposition from the Debtor. Craig Cowgill, the attorney who took over the representation after Ms. Rogers withdrew, himself withdrew from representing the Debtor on January 16, 2007, once again with this Court's permission and without opposition from the Debtor. [Finding of Fact Nos. 43-45.]

depositing $3,000.00 of exempt funds into the Chase Account converted the entire balance of that account into exempt funds—including the $50,000.00 cashier's check of nonexempt funds that Ms. Sissom deposited on April 13, 2006. Such a proposition is unsupported by case law and counterintuitive to a basic understanding of tracing and commingling.[37] Accordingly, this Court sustains the Trustee's Amended Objection to the extent of $50,000.00.

The ability to trace does benefit the Debtor in one respect. On April 19, 2006, Ms. Sissom obtained a $11,540.99 cashier's check from Chase Bank by withdrawing $2,540.99 from the Chase Account and obtaining $9,000.00 from an undisclosed source. [Finding of Fact No. 15.] The withdrawal of $2,540.99 was used for the purchase of the Bastrop Property because Ms. Sissom also sent the $11,540.00 cashier's check to Independence Title on April 20, 2006 to effectuate closing on the next day. [Finding of Fact Nos. 15, 17.] The $2,540.99 may be traced back to the $3,000.00 deposit into the Chase Account on April 12, 2006, which represented the earnest money payment made by the Perezes in contemplation of the purchase of the Missouri City Property.[38] On April 12, 2006, the balance in the Chase account was $3,928.23. From that date until the $2,540.99 withdrawal was made on April 19, 2006, the intermediate balance of the Chase account never dropped below $3,000.00. Thus, when Ms. Sissom withdrew $2,540.99 on April 19, 2006, none of the $3,000.00 had been depleted and all of it was available. Because the $2,540.99 can be traced

---

[37] If any conversion were to occur, the exempt funds would be converted into nonexempt funds, not the other way around. When exempt funds are commingled with nonexempt funds, the exempt funds lose their status as exempt if the commingling is to such a degree that the exempt assets cannot be traced. See, e.g., In re Jones, 77 B.R. 541, 549 (Bankr. N.D. Tex. 1987); In re Raelyn Sales, Inc., No. 3:01-CV-1716-M, 2002 U.S. Dist. LEXIS 2231, at * 7 (N.D. Tex. Feb. 13, 2002). The Court believes, however, that such irreversible commingling has not occurred in this case and that (a) the $50,000.00 withdrawal on April 18, 2006 can be traced to the sale of the nonexempt F & S stock; and (b) the $2,540.99 withdrawal can be traced to the $3,000.00 earnest money check relating to the sale of the Missouri City Property.

[38] See Appendix B for a detailed tracing of the $3,000.00 earnest money check.

42

from one exempt source (the Missouri City Property) to another exempt source (the Bastrop Property), the Trustee may not recover the $2,540.99.[39]

Nor may the Trustee recover the $9,000.00 that Ms. Sissom used, together with the $2,540.99 withdrawal, to purchase the $11,540.99 cashier's check. The Trustee has the burden of proving that the $9,000.00 was nonexempt money in which the Debtor had an interest. *In re Keck*, No. 05-43269, 2007 WL 643330, at *14 (Bankr. D. Kan. Mar. 2, 2007). There is no evidence in the record as to how Ms. Sissom obtained the $9,000.00. Accordingly, the Trustee has failed to meet his burden of proof on this issue, and may not recover any of this $9,000.00.

      ii.      **According to the Debtor and Ms. Sissom, the community property funds were converted into separate property of Ms. Sissom when they were placed in an account held solely in the name of Ms. Sissom.**

During the hearing, the Debtor and Ms. Sissom articulated, with some difficulty, the following argument: the Chase Account was solely in Ms. Sissom's name, and therefore any funds deposited into that account constituted her separate property over which this Court had no jurisdiction. While they did not cite any law in support thereof, they apparently are relying on Article XVI, § 15 of the Texas Constitution, which provides that:

> [S]pouses, **without the intention to defraud pre-existing creditors, may by written instrument** from time to time partition between themselves all or part of their property, then existing or to be acquired . . . whereupon the portion or interest set aside to each spouse shall be and constitute a part of the separate property and estate of such spouse.

---

[39] Black's Law Dictionary defines "earnest money" as a "deposit paid (often in escrow) by a prospective buyer (esp. of real estate) to show a good-faith intention to complete the transaction, and ordinarily forfeited if the buyer defaults." BLACK'S LAW DICTIONARY 525 (7th Ed. 1999). It is generally considered part of the proceeds of the sale of real property. *See In re Clancy & Co. Construction, Inc.*, 214 B.R. 387, 391-92 (Bankr. D. Colo. 1997). Since the $3,000.00 earnest money was a deposit by the Perezes for their purchase of the Missouri City Property from the Sissoms, these funds should be treated as part of the purchase price. Therefore, the earnest money would be exempt as an interest transferred from one exempt homestead to another within six months.

43

(emphasis added).

Like his commingling argument, this argument is without any legal support. The Debtor's argument fails in two ways. First, under Texas law, spouses may only effectuate a consensual division of community property into separate property by executing a written agreement. Here, the Debtor and Ms. Sissom did not create any written agreement acknowledging the conversion of the community property proceeds from the sale of the F & S stock. Therefore, when the Debtor gave those proceeds to Ms. Sissom to deposit in the Chase Account, he did not change their status as community property. Second, this Court has concluded that the Debtor acted with the intent to hinder, delay, or defraud a creditor in selling the F & S stock and using some of the sale proceeds to help purchase the Bastrop Property. Even if the Debtor and Ms. Sissom had a written agreement stating that the $50,000.00 cashier's check was Ms. Sissom's separate property, this Court's finding of fraudulent intent would prevail over such a writing. In short, the Debtor's separate property defense fails because the proceeds from the F & S stock sale maintained their status as community property after being deposited into the Chase Account.

### E.    Exemption of Consumer Goods Purchased on the Eve of Bankruptcy

The Trustee's Amended Objection invokes § 522(o) not only to prevent the Debtor's exemption of his interest in the Bastrop Property, but also to prevent the Debtor from exempting certain consumer goods that he purchased on the eve of filing his bankruptcy petition. There is no question that the Debtor, within 36 days of the filing of his Chapter 7 Petition, used his credit card to purchase a bunk bedroom set, a watch, two television sets, and a stereo system (the Consumer Goods). [Finding of Fact Nos. 47-50.] The aggregate amount of these purchases totaled $10,298.51. [Id.] The Trustee's Amended Objection alleges that the Debtor purchased the Consumer Goods in

44

an effort to accumulate exempt assets using non-exempt funds. Specifically, the Trustee alleges that "the Consumer Goods were purchased in an effort to accumulate exempt assets and dissipate nonexempt assets prior to the Bankruptcy filing in an effort to hinder, delay, or defraud the Debtor's creditors and/or the Trustee. Accordingly, the Consumer Goods (or the sale proceeds thereof) are not exempt assets and the Trustee should be allowed to administer the Consumer Goods for the benefit of the creditors of the Debtor's estate." [Docket No. 78, ¶63.]

Unfortunately, § 522(o) does not help the Trustee in this instance. 11 U.S.C. § 522(o) only applies to real or personal property that a debtor *uses as a residence or claims as a homestead.* While the bunk bedroom set, watch, television sets, and stereo system are certainly personal property, none of these assets could possibly constitute a principal residence or a homestead. Nor does the Trustee cite any other statutory authority or case law in support of his objection. It may well be that the credit card company which provided the financing to the Debtor to purchase these assets could have invoked 11 U.S.C. § 523(a)(2)(A) and (C)(i)(I) or (II) to prevent the discharge of the debt that the Debtor accumulated in purchasing these goods.[40] However, no statute prevents the Debtor from exempting these assets, even though he purchased them on the eve of the filing of his bankruptcy petition.

Further support for the Debtor's claimed exemption can be found elsewhere in § 522, a section which lists various types of exempt property. Subsection 522(c) identifies exceptions to these exemptions, including, in §§ 522(c)(1) and (3), property on which debts cannot be discharged. These latter sections specifically refer to §§ 523(a)(1), (4), (5), and (6), but not §§ 523(a)(2)(A),

---

[40] The Debtor apparently concurs with this conclusion because, while he was represented by Mr. Cowgill, the Debtor agreed that he would not be discharged from any of his debts. [Finding of Fact No. 46.]

(C)(i)(I) or (C)(i)(II). Congress certainly knows how to carve out exemption exceptions for certain types of property—even property for which debts could not be discharged—but Congress did not include consumer goods purchased on the eve of bankruptcy in that carve-out. Given this absence, it would be difficult to infer any Congressional intent to disallow such exemptions.

Additionally, the Court can look to the Texas law on property exemptions and find a similar lack of support for the Trustee's contention. "As a general proposition, Texas law mandates that provisions of the Texas Constitution and Texas statutes which relate to the same subject matter should be construed together, consistently, harmoniously, uniformly, and in light of each other." *In re Leva,* 96 B.R. 723, 725 (Bankr. W.D. Tex. 1989) (citing *Purcell v. Linsey,* 314 S.W.2d 283 (Tex. 1958). An instructive recent case in the Southern District of Texas examined whether an annuity purchased by a debtor one day prior to filing for bankruptcy could be claimed as exempt. *In re Soza,* 358 B.R. 903 (S.D. Tex. 2006). The *Soza* court discussed two relevant sections of the Texas Insurance Code: § 1108.051, titled "Exemptions for Certain Insurance and Annuity Benefits," and § 1108.053, titled "Exceptions to Exemptions." The latter section specifically identified payments "made in fraud of a creditor" as an exception to otherwise exempt proceeds from an annuity or insurance policy. TEX. INS. CODE ANN. § 1108.053(1) (Vernon 2006). By contrast, § 42.001 of the Texas Property Code lists personal property that may be claimed as exempt, but there is no section containing any exceptions to these exemptions. As the Texas legislature specifically created exceptions for other types of exempt property, such as annuity and insurance proceeds, the absence of any statutory exceptions to personal property exemptions strongly implies a lack of legislative intent to create such exceptions.

46

In sum, § 522(o) is inapplicable to the Debtor's purchases of the Consumer Goods, and there is no other statute preventing the Debtor from exempting these assets. Accordingly, the Trustee's Amended Objection to the Debtor's exemption of the Consumer Goods must be overruled.

### F.    What relief should be granted to the Trustee?

Having sustained, in part, the Trustee's Amended Objection to the Debtor's exemption of the Bastrop Property as his homestead, a question inevitably arises: under § 522(o), what form of relief should the Court grant to the Trustee? Section 522(o) requires that the value of the Debtor's interest in the Bastrop Property shall be reduced to the extent that proceeds from the sale of the F & S stock were used to purchase this real estate. That is, the Trustee may recover the sum of $50,000.00—the portion of the F & S stock sale proceeds used to help purchase the Bastrop Property. However, since the Debtor, like most Chapter 7 debtors, does not have $50,000.00 to pay to the Trustee, merely ordering the Debtor to pay $50,000.00 to the Trustee would not suffice. The Court must fashion some additional relief.

In the prayer paragraph of his Amended Objection, the Trustee requests that "the Court disallow the Debtor's exemption of the Nonexempt Homestead Interest . . . and order the Debtor and/or Mrs. Sissom to turn over to the Trustee the Nonexempt Homestead Interest . . . or the value thereof, and grant such other relief as may be proper and just." In other words, if the Debtor cannot pay $50,000.00 in cash, the Trustee wants this Court to order the Debtor and/or Ms. Sissom to turn over "the Nonexempt Homestead Interest." As a practical matter, neither the Debtor nor Ms. Sissom could convey a portion of the Bastrop Property worth $50,000.00.[41] Hence, this Court must fashion

---

[41] There is no evidence in the record suggesting that the Bastrop Property could be easily partitioned so that a portion of this real estate valued at $50,000.00 could be conveyed to the Trustee.

relief so that the Debtor and Ms. Sissom turn over the "Nonexempt Homestead Interest" to the Trustee; and whatever the form of this relief, it must be "proper and just" as requested in the Trustee's prayer paragraph.

There is one reported case on § 522(o) in which the bankruptcy court granted the Chapter 7 Trustee an equitable lien against the real property that was the subject of the Trustee's objection. *In re Keck*, 2007 WL 643330. However, the court in *Keck*, after granting an equitable lien, did not state whether the Trustee could immediately foreclose on this lien; one can only infer that the trustee could do so.

In the case at bar, if the Trustee, under § 522(o), is entitled to an equitable lien on the Bastrop Property upon which he can immediately foreclose, then there is a conflict with the Texas Constitution, which "specifically protects homesteads from forced sales except to satisfy liens securing purchase money, tax, or home improvement debts." *Magallanez v. Magallanez*, 911 S.W. 2d 91, 94 (Tex. App.—San Antonio 1995) (citing TEX. CONST. art. XVI, § 50; TEX. PROP. CODE ANN. § 41.002 (Vernon 2006)). Subsequent to *Magallanez*, Article XVI, § 50 of the Texas Constitution was amended to add home equity loans to the list of loans for which a forced foreclosure sale may be held. TEX. CONST. art. XVI, § 50(a)(6)(A); *see also Box v. First State Bank*, 340 B.R. 782, 784 (S.D. Tex. 2006). Facially, an equitable lien under § 522(o) is neither a purchase money lien, a tax lien, a mechanic's lien, nor a home equity lien, and it would appear that granting the Trustee an equitable lien on the Bastrop Property would violate the Texas Constitution if the Trustee is allowed to hold a forced foreclosure in order to recover the $50,000.00

Arguably, however, § 522(o) and the Texas Constitution can be harmonized. In *Magallanez*, an ex-husband was required to convey his community property interest in the homestead to his ex-

wife in exchange for a note and deed of trust on the homestead. *Magallanez*, 911 S.W. 2d at 95.

The ex-wife was unable to make the payments on the note when they came due. *Id.* The court held

that a vendor's lien arose because the husband had essentially "sold" his interest in the house to his

ex-wife, and he therefore had the right to foreclose on the ex-wife's homestead because his lien was

a purchase money lien. *Id.* In the instant case, the Trustee has a similar lien on the Debtor's

homestead under § 522(o). The Debtor is liable to the Trustee for the conversion of nonexempt F

& S stock into cash, a portion of which the Debtor then used to purchase the Bastrop Property. Put

another way, the nonexempt funds from the sale of F & S stock made the purchase of the Bastrop

Property possible. Thus, on the facts of the instant case, an equitable lien granted to the Trustee

gives him the right to foreclose on the Debtor's homestead in the same manner as any other holder

of a purchase money security interest.

      In the alternative, if this Court is incorrect in its view that § 522(o) and the Texas

Constitution can be harmonized, then § 522(o) must be applied because when federal law and state

law conflict, federal law governs. *In re Gary Aircraft Corp.*, 681 F.2d 365, 369 (5th Cir. 1982)

("[T]he supremacy clause, U.S. Const. art VI, requires us to invalidate state law only if it conflicts

with a general statute, if it would frustrate a federal scheme, or if the totality of the circumstances

shows that Congress sought to occupy the field. The intent of Congress is determinative."); *In re*

*Thompson*, 59 B.R. 690, 693 (Bankr. W.D. Tex. 1986) ("The supremacy clause under Article VI,

clause 2 of the United States Constitution provides that Congressional intent as enacted into federal

law must prevail when state statutes conflict with the underlying policies of federal law or have the

practical consequence of making the federal law unenforceable.")

In the case at bar, the tension is between the sanctity of homestead rights in Texas[42] versus the Trustee's right, under § 522(o), to recover cash in the amount of nonexempt property used to purchase the Bastrop Property so that this cash may be expeditiously distributed to creditors. In Texas, forced foreclosure sales are only permissible when done by holders of purchase money liens, mechanic's liens, tax liens, or home equity loans. *Magallanez*, 911 S.W. 2d at 94; TEX. CONST. art. XVI, § 50(a)(6)(A). Assuming that any equitable lien which this Court grants to the Trustee on the Bastrop Property is not a purchase money lien, then under Texas law the Trustee could not force a foreclosure sale of the Bastrop Property. He would have to wait until the Debtor and Ms. Sissom voluntarily sold the Bastrop Property, and then receive the funds to pay off his equitable lien. Such a scenario is at odds—at least to some extent—with § 704(a)(1), which requires the Trustee to "collect and reduce to money the property of the estate for which the trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." One circuit court has even held that the duty to close the estate expeditiously is a Chapter 7 Trustee's "main duty" and "overriding responsibility." *In re Hutchinson*, 5 F.3d 750, 753 (4th Cir. 1993) (citations omitted).

The court in *Hutchinson*, however, also noted that the Trustee's affirmative duty to reduce property of the estate to money and close the estate expeditiously must be done with an eye towards the best interests of parties-in-interest. *Id.* The key question on what relief to grant to the Trustee

---

[42] The Fifth Circuit has observed that "In Texas, homestead rights are sacrosanct." *In re McDaniel*, 70 F.3d 841, 843 (5th Cir. 1995). Indeed, the Fifth Circuit very aptly described the high level of protection afforded homesteads in Texas by noting that: "We must give a liberal construction to the constitutional and statutory provisions that protect homestead exemptions. Indeed, we must uphold and enforce the Texas homestead laws even though in so doing we might unwittingly—or even knowingly, but powerless to avoid it—assist a dishonest debtor in wrongfully defeating his creditor. This may account for the oft-repeated creditor's lament: 'Debtors either die or move to Texas.'" *Id.* (citations omitted).

50

boils down to this: Is granting the Trustee an equitable lien on the Bastrop Property <u>and</u> allowing the Trustee to hold a forced foreclosure sale on the Bastrop Property to satisfy this equitable lien "compatible with the best interests of parties-in-interest"?  As an initial matter, this Court notes that the Debtor and Ms. Sissom are parties-in-interest by virtue of the fact that it is their homestead upon which an equitable lien has been granted.  *See In re Poland*, 222 B.R. 371, 373 (Bankr. M.D. Fla. 1998) (suggesting that a Chapter 7 debtor is a party-in-interest and has standing to object to the trustee's expeditious liquidation of an asset of the estate pursuant to the trustee's duties under 11 U.S.C. § 1104(a)(1)).  There is no question that the Trustee and creditors of the Chapter 7 estate are parties-in-interest.

The Debtor and Ms. Sissom do not want foreclosure to occur, but rather want the Trustee and the creditors to wait until the Debtor and Ms. Sissom can obtain enough cash to pay the Trustee, either by means of a gift, financing from a third party, or the voluntary sale of the Bastrop Property. The Trustee and creditors, on the other hand, want to reduce the equitable lien to cash as quickly as possible so the Trustee can make distributions to the creditors, and the quickest way to do so is through a forced foreclosure on the Bastrop Property.  This Court must balance the Trustee's duty to expeditiously close this Chapter 7 estate and the creditors' interest in receiving a distribution from the Trustee as soon as possible against the interests of the Debtor, his wife, and their two minor children, the latter three of whom have been residing at the Bastrop Property for about a year and have no other residence.

This Court concludes that the proper and just relief in the case at bar is (1) to grant the Trustee an equitable lien on the Bastrop Property in the amount of $50,000.00; (2) to give the Debtor and Ms. Sissom 120 days to pay off this lien; and (3) to allow the Trustee to foreclose his lien on the

Bastrop Property if the Debtor and Ms. Sissom have not paid off the lien within 120 days. Not granting the Trustee such relief would render § 522(o) a nullity: how else could the Trustee expeditiously recover the $50,000.00 for distribution to creditors of the Debtor's Chapter 7 estate?

The Court supposes that the Debtor could argue that the Trustee's lien ought not to be paid off until the Debtor and Ms. Sissom voluntarily sell the Bastrop Property. Indeed, this argument would be consistent with the public policy behind Texas' longstanding protection of homesteads, namely, "to protect citizens and their families from the miseries and dangers of destitution." *In re Bradley*, 960 F.2d 502, 505 (5th Cir. 1992) (quoting *Franklin v. Coffee*, 18 Tex. 413, 415-16 (1857); *In re Sorrell*, 292 B.R. 276, 280 (Bankr. E.D. Tex.2002). However, given the Trustee's statutory duty to close the estate expeditiously and the creditors' interest in receiving distributions as soon as possible, it would be an inappropriate balancing of the interests of the parties to let the Debtor and Ms. Sissom decide when they want to pay off the lien. One of the twin pillars of bankruptcy is payment of claims. *In re Ortiz*, No. 05-39982, 2006 Bankr. LEXIS 2797, at *27 (Bankr. S.D. Tex. Oct. 13, 2006) ("[T]he laws and jurisprudence of bankruptcy note often that there are two competing goals of bankruptcy and reorganization. One is the satisfaction of valid claims against the estate. The other is to allow the debtor a 'fresh start' in the marketplace.") (quoting *In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997). The Court must be mindful of the public policy of paying claims expeditiously in determining when to allow the Trustee to hold a forced foreclosure sale on the Bastrop Property.

Conversely, allowing the Trustee to immediately foreclose on his lien would be a skewed balancing of the interests of the parties as well as a gross violation of Texas public policy, because the Debtor and Ms. Sissom have two minor children and they own no other real property.

52

Accordingly, giving the Debtor and his wife 120 days to pay off the $50,000.00 lien represents a proper and just balancing of the equities.

## IV. CREDIBILITY OF WITNESSES

At the hearing on the Trustee's Amended Objection, seven witnesses testified: (1) the Debtor; (2) Ms. Sissom, the Debtor's wife; (3) Barbara Rogers, the Debtor's first counsel; (4) Ron Sommers, the Trustee; (5) Jose Perez, who, together with his wife Sandra, purchased the Missouri City Property from the Debtor and Ms. Sissom; (6) Kathie Starr, a representative of Chase Bank; and (7) Boude Story II, the attorney for Royal Oaks Bank. Set forth below are this Court's findings regarding the credibility of each of these witnesses.

The Debtor: The Court finds that the Debtor's testimony is not credible. Aside from the repeated, and in certain instances absurd, amendments already discussed in this Opinion, the Debtor's credibility is wholly lacking for the following reasons:

(1) Under cross-examination, he conceded that he did not schedule the Bastrop Property in his original Schedule A despite knowing about the purchase of this property prior to filing his Chapter 7 petition. Indeed, when pressed at the hearing about his failure to disclose the Bastrop Property, the Debtor admitted that he had committed perjury by failing to disclose this asset;[43]

---

[43] At the initial meeting of creditors held on May 24, 2006, the Trustee expressly asked the Debtor the following question: "Have you listed on your schedules all of your wife's assets and all of your assets?" The Debtor responded: "Yes, sir." The Trustee then asked the following question: "Your wife does not have any separate property at this time?" The Debtor responded definitively: "No, sir." [Exhibit No. 59, 4:3-9.] Given that the Bastrop Property was purchased on April 21, 2006, the Debtor's testimony at the hearing that he had committed perjury during the initial meeting of creditors was on point. At the time the Trustee had asked him these questions, he knew full well that the Bastrop Property had been purchased.

(2) The Debtor initially failed to disclose the sale of the F & S stock, which was a significant transaction and evidenced the Debtor's need for cash to help pay bills which had gone unpaid due to the Debtor's dire financial condition;

(3) After the filing of his Chapter 7 petition, the Debtor, without approval from the Trustee or this Court, sold property of the estate for the amount of $18,115.00. [Finding of Fact No. 51.] Moreover, the Debtor made no disclosure of this sale to Ms. Rogers or to the Trustee, and to this day has not turned over the sale proceeds to the Trustee;[44]

(4) The Debtor has failed to account to the Trustee for various monies. The Debtor has not explained the $15,000.00 payment by Ms. Sissom, using proceeds from the sale of the F & S stock, to an entity called Buttross Properties, nor has he explained her $20,000.00 payment to Carz N More, which also used proceeds from the sale of the F & S stock. Nor has the Debtor explained what became of the $70,426.78 cashier's check that Ms. Sissom obtained using proceeds from the sale of the Missouri City Property. Additionally, the Debtor has not turned over to the Trustee either the $10,000.00 that he represented in his original Schedule B was on deposit in the Chase Account or the $5,227.00 that he represented in his amended Schedule B was on deposit in the same account. Finally, the Debtor has not turned over to the Trustee the $18,115.00 representing the proceeds from the garage sale held on June 3 and 4, 2006;

---

[44] While the Debtor and Ms. Sissom might contend that the property which they sold was exempt, the fact is that the garage sale took place on June 3 and 4, 2006—which means that the deadline for the Trustee and any creditor to object to the exemptions had not yet expired. The initial meeting of creditors was held on May 24, 2006, which means that, at the earliest, the deadline to lodge objections to exemption was June 23, 2006 pursuant to Bankruptcy Rule 4003(b). Accordingly, the property sold at the garage sale was not yet exempt and therefore belonged to the Trustee. *Calvin v. Wells Fargo, N.A.* (*In re Calvin*), 329 B.R. 589, 597 (Bankr. S.D. Tex. 2005). Because the property belonged to the Trustee, the proceeds from the sale of the property also belong to the Trustee.

(5) The Debtor represented in his Schedules that he owned a BMW, but on cross-examination conceded that he did not own this vehicle, but rather was borrowing it from a friend;

(6) In his original Schedules, the Debtor failed to disclose a 52" Mitsubishi television and a smaller television, a Bose surround sound stereo system, a television stand, and a bunk bedroom set for one of his minor sons. His failure to disclose these items was particularly egregious because he purchased them with his credit cards within a few weeks prior to filing his Chapter 7 petition. [Exhibit No. 39.] The amount of these purchases was approximately $7,000.00;

(7) The Debtor gave to the Trustee a two-page list of expenditures which purported to represent how the Debtor spent the proceeds from the sale of the Missouri City Property. [Exhibit No. 30.] Except for the line item showing that the lien on this property was paid off with some of these proceeds, the other listed expenditures were either never made or made in amounts different than the amounts shown by the Debtor. [Id.] Accordingly, the Debtor deliberately provided false information to the Trustee;

(8) The Debtor gave to the Trustee a list showing how the proceeds received from Crown were used. [Exhibit No. 37.] This list shows that there were 44 uses of the proceeds, but nowhere in this list did the Debtor disclose that any of the monies were used to help purchase the Bastrop Property. Given that the Debtor himself gave his wife four cashier's checks totaling $189,740.00 and that Ms. Sissom thereafter used $50,000.00 of these proceeds to help buy the Bastrop Property, this Court can draw no other conclusion than that the Debtor deliberately provided false information to the Trustee;

(9) Under cross-examination, the Debtor conceded that he should have disclosed the $10,000.00 check he received from Jose and Sandra Perez [Exhibit No. 45];

(10)   Certain testimony that the Debtor gave at the hearing demonstrated a reckless indifference to the truth. For example, when counsel for the Trustee asked him whether he reviewed his amended SOFA of September 8, 2006, his response was that "I can't read everything that is put in front of me." By way of a second example, after giving testimony at the hearing that contradicted his testimony at the meeting of creditors, the Trustee's counsel asked the Debtor to explain his testimony at the meeting of creditors.   The Debtor's response was flippant at best and an implied concession of perjury at worst: "If I wasn't in the right state of mind, please excuse me."   A third example of the Debtor's attitude came when he testified that he did not know about the $50,000.00 cashier's check that Ms. Sissom had in her possession and used to facilitate the purchase of the Bastrop Property.   The Debtor testified that he was unaware of this check and how his wife was using the monies because "These were little things."   Without even considering the Debtor's arrogance and condescension toward the Court, his testimony strains credulity because he gave his wife the funds himself.

(11) At the hearing on the Amended Objection, the Debtor testified that his wife's expenditure of funds from the sale of the F & S stock was her business, not his, because the funds were deposited into the Chase Account, which he noted was in her name only.   Even assuming that the funds in the Chase Account were Ms. Sissom's separate property—which they are not—the Debtor told the Trustee under oath that his wife did not have any separate property.   Hence, either the Debtor was lying to the Trustee at the meeting of creditors or he was attempting to deceive this Court at the hearing by arguing that how his wife spent the proceeds in the Chase Account was irrelevant because the proceeds were her separate property.

All in all, this Court finds that the Debtor was not a credible witness. Accordingly, this Court gives virtually no weight to his testimony at the hearing.

Ms. Sissom: Ms. Sissom's credibility is not much better than the Debtor's. At the hearing, she gave testimony that contradicted certain documents introduced into the record by the Trustee.

(1) Ms. Sissom testified that the $61,540.99 that she sent to Independence Title Company on April 20, 2006 as the down payment for the purchase of the Bastrop Property were funds that came from the proceeds of the sale of the Missouri City Property. This testimony was false for several reasons. First, the purchase of the Bastrop Property took place before the sale of the Missouri City Property; therefore, there is no way that the $61,540.99 could have been proceeds from the sale of the Missouri City Property. Indeed, except for the $3,000.00 earnest money check which they gave to the Debtor and Ms. Sissom on April 11, 2006, the Perezes (i.e., the purchasers of the Missouri City Property) did not wire transfer the monies to purchase this property until April 24, 2006. [Finding of Fact No. 21.] Second, the trail of checks which the Trustee introduced into the record indicates that, at a minimum, $50,000.00 of the $61,540.99 down payment came from proceeds from the sale of the F & S stock.[45] Thus, her testimony at trial that the down payment came from the sale of the Missouri City Property was both false and unbelievable.

(2) The loan application that Ms. Sissom completed and submitted to AWL to obtain financing for the purchase of the Bastrop Property contained several glaring inaccuracies. In it, she represented that she had worked at DMGI since 1997 and earned monthly income of $15,000.00.

_____

[45] As previously discussed, the Debtor used $189,740.00 of the sale proceeds from the F & S stock to purchase four cashier's checks for his wife in the amounts of $39,740.00, $50,000.00, $50,000.00, and $50,000.00 respectively. [Finding of Fact No. 7.] She subsequently used one of these $50,000.00 checks as earnest money by depositing the monies into the Chase Account, then obtaining a cashier's check made payable to Independence Title Company. [Finding of Fact Nos. 15, 18.]

[Exhibit No. 54, p. 000043.] However, the 2003 and 2004 tax returns for the Debtor and Ms. Sissom do not reflect that Ms. Sissom had earned $15,000.00 per month from DMGI, or for that matter, that she had earned any income at all. [Exhibit Nos. 28 and 29.]  Accordingly, Ms. Sissom was either making misrepresentations to the lender in order to obtain financing for the Bastrop Property or, alternatively, submitting false tax returns to the IRS.  Under either scenario, her credibility is seriously compromised.[46]

(3) Ms. Sissom testified that she alone owns the Bastrop Property, and that sole ownership was her intention when she signed the AWL loan application. Yet the loan application plainly sets forth that title will be held in the name of the Debtor and Ms. Sissom, and that the Bastrop Property will be community property. [Exhibit No. 54, p.000042.] Accordingly, Ms. Sissom either made misrepresentations to the lender in order to obtain financing or falsely testified in court.  Either alternative casts serious doubt on her credibility.

(4) In the AWL loan application, Ms. Sissom represented to the lender that one of her assets was "car receivables for $262,027.00." [Exhibit No. 54, p. 000044.] At the hearing, she could not explain what these receivables were.  The Court has serious doubts that Ms. Sissom owns these receivables.

All in all, Ms. Sissom's credibility is highly suspect and this Court gives scant weight to her testimony.

---

[46] At the initial meeting of creditors held on May 24, 2006, when the Trustee asked the Debtor what Ms. Sissom's occupation was, he answered that, "She's just a mother." [Exhibit No. 59, 4:14-15.]  Moreover, when the Debtor completed an information sheet given to him by his first attorney, Barbara Rogers, so that she could become better acquainted with the Debtor's financial affairs, the Debtor, in responding to the question as to what his spouse's occupation was, wrote "N/A" next to this question. [Exhibit No. 68-B.]  These circumstances reflect that the Debtor himself knows that his wife, contrary to her representations in the loan application, did not work at DMGI since 1997 and did not earn monthly income of $15,000.00.

Barbara Rogers: Barbara Rogers, the Debtor's first attorney, was a highly credible witness and kept good notes of her meetings with the Debtor. After the Debtor agreed to waive the attorney-client privilege, Ms. Rogers gave extensive testimony about her communications with the Debtor while she represented him in his Chapter 7 case.

(1) Ms. Rogers testified unequivocally that she had told the Debtor that unless Ms. Sissom and he were divorced on the date that he filed his bankruptcy petition, he would have to schedule all community property.[47] As the Court has already noted, since no divorce has ever taken place, the Debtor should have originally scheduled the Bastrop Property, which was clearly purchased during a time when the Debtor and Ms. Sissom were married. Indeed, when testifying at the hearing, Ms. Rogers emphasized that her notes reflected that on March 3, 2006, April 10, 2006, and May 3, 2006 she discussed with the Debtor the need to disclose all community property. This Court can reach no other conclusion than that the Debtor was on notice that disclosure was required. Nevertheless, the Debtor failed to disclose to Ms. Rogers that the Bastrop Property was purchased in April 2006, and he also failed to disclose this asset in his original Schedules.

(2) Ms. Rogers candidly testified that the Debtor never disclosed to her the numerous assets which Ms. Sissom sold at the garage sale for approximately $18,115.00. [Exhibit No. 40.] {Once again, the Debtor failed to make key disclosures to his lawyer or in any of the Schedules, original or amended.

---

[47] Community property is property of the debtor's bankruptcy estate even if the debtor's spouse does not join in the bankruptcy filing, *In re McCloy*, 296 F.3d at 373, and needs to be disclosed. *See U.S. v. Johnston*, 267 B.R. at 722 (holding that the Official Form for Schedule A, regarding real property, requires disclosing whatever kind of interest the Debtor has, including whether it is a community interest).

(3) Ms. Rogers testified that she met with the Debtor on April 10, 2006 to review the draft schedules. She further testified that if she had known about the assets which the Debtor failed to disclose to her, she would have insisted that these assets be scheduled. Indeed, her testimony focused on the engagement letter that she reviewed with the Debtor at the April 10, 2006 meeting and had him sign. [Exhibit No. 68-G.] She particularly emphasized what she referred to as the "Miranda warning" paragraph of the letter, concerning the need for complete accuracy in the Schedules and SOFA to be filed with this Court. Specifically, this paragraph reads as follows:

> By execution of this letter agreement you are representing to me that all information that you have furnished to me for inclusion in the schedules and statement of affairs is true and correct. If you fail to list a creditor then that debt will not be discharged. Also, if you fail to disclose all of your assets you could be charged with a Bankruptcy Crime. Last but not least, if you make careless errors on your schedules that are misleading, you could be denied a discharge on all of your debts.

[*Id.*]

Ms. Rogers' testimony and the engagement letter lead this Court to conclude that Ms. Rogers had made it abundantly clear to the Debtor that he had to be truthful and accurate in his disclosures. He has failed miserably to do so; indeed, Ms. Rogers testified to this effect at the hearing. It is no wonder that Ms. Rogers, once she concluded that her client had not been truthful to her or his creditors, decided that she could not represent the Debtor, at which point this Court granted a Motion to Substitute Counsel. [Docket Nos. 33 and 39.]

All in all, Ms. Rogers was forthright and extremely knowledgeable in the testimony that she gave at the hearing. This Court finds her to be a very credible witness.

The Trustee: Ron Sommers, the Trustee, also testified at the hearing. The Court finds that Mr. Sommers is a highly credible witness whose testimony reflected his attention to detail,

particularly with respect to the Debtor's prepetition financial transactions. Much of his testimony concerned either the misinformation that the Debtor provided to him or the Debtor's lack of disclosure about various financial transactions. Specifically, the Trustee's testimony addressed the following matters, among others:

(1) The list of expenditures [Exhibit No. 30] that the Debtor provided on or about May 23, 2006, reflecting how the proceeds of the sale of the Missouri City Property were used, was patently false.

(2) The Debtor had not initially told the truth about his interest in DMGI.

(3) The itemization of the proceeds that the Debtor provided on or about May 31, 2006 [Exhibit No. 35], purporting to reflect what the Debtor did with the proceeds received from Crown for the purchase of the F & S stock, was patently false.

(4) The Debtor has still not turned over the $10,000.00 that the Debtor represented in his original Schedules were on deposit in the Chase Account.

(5) The Debtor has still not turned over the $5,227.00 that the Debtor represented in his amended Schedules were on deposit in the Chase Account.

Jose Perez: Mr. Perez, the individual who, together with his wife, purchased the Missouri City Property from the Debtor and Ms. Sissom, was a credible witness. Although his testimony was brief, he testified about one particular point that was important in assessing the credibility of the Debtor and Ms. Sissom.

Mr. Perez testified that he and his wife wire transferred the sum of $75,426.78 to the Chase Account on April 24, 2006 to effectuate the purchase of the Missouri City Property. His testimony, therefore, confirms that the Debtor and Ms. Sissom could not possibly have used the proceeds from

their sale of the Missouri City Property to purchase the Bastrop Property because the funds remitted by the Perezes were not wire transferred until (a) **four days after** Ms. Sissom had sent, by overnight delivery, two cashier's checks totaling $61,540.99 to Independence Title Company to facilitate the purchase of the Bastrop Property [Finding of Fact No. 17]; and (b) **three days after** Independence Title Company conducted the closing on the purchase of the Bastrop Property. [Finding of Fact No. 18.] Thus, by his credible testimony, Mr. Perez helped convince this Court that the testimony given by the Debtor and Ms. Sissom—that the Bastrop Property was purchased with proceeds from the sale of the Missouri City Property—was false.[48]

Kathie Starr: Ms. Starr is an employee at Chase Bank who has worked for that institution for 23 years. She oversees the daily operations of the branch of Chase Bank used by the Debtor and his wife. Her testimony was brief, and while she was a credible witness, her testimony was not crucial to the Trustee's case-in-chief and if she had not testified at all, this Court's decision would nevertheless remain the same.

Boude Storey II: Mr. Storey is the attorney for Royal Oaks Bank. His testimony was brief, and while he was a credible witness, his testimony was not crucial to the Trustee's case-in-chief and if he had not testified at all, this Court's decision would nevertheless remain the same.

# V. CONCLUSION

This Court is keenly aware of the primacy of the homestead in Texas. Indeed, both the Supreme Court of Texas and the Fifth Circuit have expressly held that homesteads are protected

---

[48] Although the documents concerning both the purchase of the Bastrop Property and the sale of the Missouri City Property, standing alone, constitute sufficient evidence to support this Court's finding that the testimony of the Debtor and Ms. Sissom is false, Mr Perez's testimony unequivocally supports this finding.

from forced sales even if such protection assists a dishonest debtor in wrongfully defeating his creditors. *Cocke v. Conquest*, 35 S.W. 2d 673, 678 (Tex. 1931); *In re McDaniel*, 70 F.3d at 843.[49] If this case had been filed prior to BAPCPA taking effect, the Debtor's position that this Court should overrule the Amended Objection would be a stronger argument than is the case now that BAPCPA is applicable: after all, what the Debtor and his wife did—use nonexempt funds to help purchase their exempt homestead in Bastrop—was generally not considered improper prior to the passage of BAPCPA. Indeed, as the very first paragraph of this Opinion notes, the legislative history of the Bankruptcy Code encouraged such action.

However, a sea change with respect to protection of homesteads has occurred with the passage of BAPCPA—or, more specifically, with the enactment of § 522(o). The meaning of this statute is plain: a debtor may not exempt the value of his homestead attributable to the infusion of proceeds obtained through the sale of nonexempt property within the ten-year period prior to the filing of the bankruptcy petition.[50] "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242.

The enactment of § 522(o) means that some debtors may lose their homesteads through forced sales undertaken by successfully objecting trustees or creditors who are awarded an equitable lien on the real property. Such a result does not appear to be at odds with the intentions of the drafters of § 522(o). Congress passed § 522(o) with the intent of limiting the amount of pre-

---

[49] *See* Footnote 42.

[50] Of course, as noted earlier in this Opinion, the party objecting to the exemption must also prove that the debtor disposed of the nonexempt property with the intent to hinder, delay, or defraud a creditor.

bankruptcy actions a debtor could take to increase the equity in his or her homestead. Among other reasons, Congress passed BAPCPA to minimize abuse by debtors and ensure that debtors repay creditors the maximum amounts they can afford. H.R. Rep. 109-31, pt. 1 at 1, *as reprinted in* 2005 U.S.C.C.A.N. 88, 89 (2005). Therefore, debtors who have filed petitions after the passage of BAPCPA, including the Debtor in the case at bar, put their homesteads at risk to the extent that nonexempt assets have been sold and the proceeds used to increase the debtor's equity in the homestead, or in the principal residence of dependents of the debtor.

For the reasons set forth herein, this Court concludes that the Trustee, through testimony adduced from various witnesses, including the Debtor and Ms. Sissom, and through introduction of numerous exhibits, has met his burden of proof under § 522(o). The Trustee has done so by showing that: (1) the Debtor sold his 500 shares of F & S stock well within the ten years preceding his Chapter 7 filing; (2) the F & S stock was nonexempt; (3) $50,000.00 of the $189,740.00 received by the Debtor from the sale of the F & S stock was used to help purchase the Bastrop Property, which is the Debtor's homestead or, alternatively, the principal residence of his wife and two dependent minor sons; (4) and the Debtor sold his shares of F & S stock with the intent to hinder, delay, or defraud a creditor.

Under these circumstances, this Court sustains in part the Trustee's Amended Objection in the amount of $50,000.00. Accordingly, the Debtor's homestead exemption in the Bastrop Property is reduced by $50,000.00 and the Trustee is awarded an equitable lien on this property in the amount of $50,000.00. In the alternative, even if the Bastrop Property is not the Debtor's homestead, the Court sustains the Trustee's Amended Objection in the amount of $50,000.00 and, accordingly, the

Trustee is awarded an equitable lien in the amount of $50,000.00 on the Bastrop Property because it is the principal residence of the Debtor's two dependents, namely, his two minor sons.

Further, on the 120th day after the entry of the order on the docket regarding the Amended Objection, the Trustee shall be allowed to foreclose his lien, pursuant to applicable state law, on the Bastrop Property as if this lien were a purchase money lien. In the alternative, even if the Trustee's equitable lien is not the equivalent of a purchase money lien under Texas law, the Trustee shall be allowed to foreclose his lien through any applicable law, state or federal.

The Trustee's Amended Objection is overruled with respect to all other relief requested by the Trustee.

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed this 11th day of May, 2007.

Jeff Bohm
United States Bankruptcy Judge

## APPENDIX A

Tracing the $50,000.00 (from the sale of the F & S stock) used to help purchase the Bastrop Property through reviewing the deposits into and the withdrawals from the Chase Account for the period of April 6, 2006 through April 18, 2006 (taken from Exhibit 20, which is the monthly statement for the Chase Account)

| Date | Deposit | Withdrawal | Running Balance |
|------|---------|------------|-----------------|
| 4/06 |  |  | 520.67 |
| 4/06 | 5,500.00 |  | 6,020.67 |
| 4/06 |  | (131.18) | 5,889.49 |
| 4/06 |  | (21.00) | 5,868.49 |
| 4/06 |  | (74.83) | 5,793.66 |
| 4/06 |  | (12.42) | 5,781.24 |
| 4/07 |  | (11.50) | 5,769.74 |
| 4/10 |  | (5.48) | 5,764.26 |
| 4/11 |  | (99.95) | 5,664.31 |
| 4/11 |  | (36.70) | 5,627.61 |
| 4/11 |  | (95.17) | 5,532.44 |
| 4/12 |  | (800.00) | 4,732.44 |
| 4/12 |  | (22.63) | 4,709.81 |
| 4/12 |  | (30.40) | 4,679.41 |
| 4/12 |  | (484.38) | 4,195.03 |
| 4/12 |  | (93.32) | 4,101.70 |
| 4/12 |  | (30.00) | 4,071.71 |
| 4/12 |  | (72.95) | 3,998.76 |
| 4/12 |  | (46.55) | 3,952.21 |
| 4/12 |  | (13.98) | 3,938.23 |
| 4/12 |  | (10.00) | 3,928.23 |
| 4/12 | 3,000.00 |  | 6,928.23 |
| 4/13 |  | (177.11) | 6,751.12 |
| 4/13 |  | (2,155.56) | 4,595.56 |
| 4/13 |  | (45.00) | 4,550.56 |
| 4/13 |  | (9.74) | 4,540.82 |
| **4/13** | **50,000.00** |  | **54,540.82** |
| 4/14 |  | (220.82) | 54,320.00 |
| 4/17 |  | (211.19) | 54,108.81 |
| 4/17 |  | (35.93) | 54,072.88 |
| 4/17 |  | (25.00) | 54,047.88 |
| 4/17 |  | (8.61) | 54,039.27 |
| 4/17 |  | (41.57) | 53,997.70 |
| 4/17 |  | (138.34) | 53,859.36 |
| 4/17 |  | (50.00) | 53,809.36 |
| 4/18 |  | (182.29) | 53,627.07 |
| 4/18 |  | (63.38) | 53,563.69 |
| **4/18** |  | **(50,000.00)** | **3,563.69** |

## APPENDIX B

Tracing the $3,000.00 earnest money received by the Debtor and his wife from Mr. and Mrs. Perez for the sale of the Missouri City Property by reviewing the deposits into and the withdrawals from the Chase Account for the period of April 12, 2006 through April 19, 2006 (taken from Exhibit 20, which is the monthly statement for the Chase Account)

| Date | Deposit | Withdrawal | Balance |
|------|---------|------------|---------|
| **4/12** | | | **3,928.23** |
| **4/12** | **3,000.00** | | 6,928.23 |
| 4/13 | | (177.11) | 6,751.12 |
| 4/13 | | (2,155.56) | 4,595.56 |
| 4/13 | | (45.00) | 4,550.56 |
| 4/13 | | (9.74) | 4,540.82 |
| 4/13 | 50,000.00 | | 54,540.82 |
| 4/14 | | (220.82) | 54,320.00 |
| 4/17 | | (211.19) | 54,108.81 |
| 4/17 | | (35.93) | 54,072.88 |
| 4/17 | | (25.00) | 54,047.88 |
| 4/17 | | (8.61) | 54,039.27 |
| 4/17 | | (41.57) | 53,997.70 |
| 4/17 | | (138.34) | 53,859.36 |
| 4/17 | | (50.00) | 53,809.36 |
| 4/18 | | (182.29) | 53,627.07 |
| 4/18 | | (63.38) | 53,563.69 |
| 4/18 | | (50,000.00) | 3,563.69 |
| 4/19 | | (330.68) | 3,263.96 |
| 4/19 | | (45.00) | **3,218.96** |
| **4/19** | | **(2,540.99)** | 677.97 |

**APPENDIX C**

Summary of the Debtor's solvency and insolvency through each set of amended Schedules

| Date of Schedules | Total Assets | Total Liabilities | Solvency/Insolvency |
|---|---|---|---|
| May 3, 2006 | $1,293.495.00 | $1,059,244.09 | $234,250.91 |
| August 17, 2006 | $393,495.00 | $1,059,244.09 | ($665,749.09) |
| August 29, 2006 | $3,748,961.59 | $893,375.58 | $2,855,586.01 |
| August 29, 2006, subtracting the value of the F & S stock and adding the debt owed to Royal Oaks | $948,961.59 | $1,588,460.58 | ($639,398.99) |
| September 8, 2006 | $998,961.59 | $1,374,290.58 | ($375,328.99) |
| September 12, 2006 | $1,408,961.59 | $1,374,290.58 | $34,671.01 |
| November 8, 2006 | $700,557.95 | $1,313,842.58 | ($613,284.63) |